UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                          :
In re                                     :          Case Nos. 22-bk-40563 (JMM)
                                          :                          22-bk-40562 (JMM)
36TH STREET PROPERTY, INC., and           :
HR 442 CORP.,                             :          Chapter 11
                                          :
                            Debtors.      :
                                          :
---------------------------------------------------------x

**DEBTORS' MOTON FOR AN ORDER: (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO BANKRUPTCY CODE §§ 363(b)(f) AND (m) AND FEDERAL BANKRUPTCY RULES 2002, 6004 AND 6006 TO STALKING HORSE, SUBJECT TO HIGHER AND BETTER OFFERS; (B) ESTABLISHING PROCEDURES FOR THE SUBMISSION OF HIGHER AND BETTER OFFERS; (C) SCHEDULING A HEARING TO APPROVE THE SALE; AND (D) PROVIDING FOR THE PAYMENT OF SECURED NOTEHOLDER CLAIM SUBJECT TO AN AGREED CARVE OUT, AND INCORPORATED MEMORANDUM OF LAW**

TO:     THE HONORABLE JIL MAZER-MARINO,
        UNITED STATES BANKRUPTCY JUDGE:

        36th Street Property Inc. (the "Owner Debtor") and HR 442 Corp. (the "Operator Debtor")

(collectively, the "Debtors") as and for their *Motion For An Order: (A) Approving Sale of*

*Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances*

*Pursuant to Bankruptcy Code §§ 363(b), (f) and (m) and Federal Bankruptcy Rules 2002, 6004*

*and 6006 to Stalking Horse, Subject to Higher and Better Offers; (B) Establishing Procedures for*

*the Submission of Higher and Better Offers; (*C*) Scheduling a Hearing to Approve the Sale; and*

*(D) Providing for the Payment of Secured Noteholder Claim From the Operator Debtor Carve*

*Out, Subject to an Agreed Carve Out, and Incorporated Memorandum of Law* (the "Motion"),

respectfully represent:

**Background**

1.      On March 22, 2022 (the "Petition Date"), the Debtors filed their Chapter 11 bankruptcy petitions with the Court.

2.      By order, dated April 25, 2022, the Debtors' bankruptcy cases are being jointly administered for procedural purposes only.  [Dkt. No. 19].

3.      The Owner Debtor is the owner of the real property and improvements located at 442 West 36th Street in Manhattan (the "Property").

4.      The Operator Debtor operates an independent, non-flagged hotel located at the Property, which is known as the Hudson River Hotel (the "Hotel").  The Hotel is a fifteen story, 56 room limited service hotel which is located on the west side of Manhattan, near the Lincoln Tunnel.

5.      The Debtors are sister corporations, which are wholly owned by Ae Sook Choi.

**The Loan and the Loan Documents**

6.      Pursuant to a loan agreement (the "Loan Agreement"), between the Debtors, as borrowers and Ladder Capital Finance LLC (the "Original Lender"), as lender, the Original Lender made a loan to the Debtors in the original principal amount of $14,200,000.00 (the "Loan").  The Debtors are jointly and severally liable for all obligations under the Loan.  A true and correct copy of the Loan Agreement as amended is annexed as Exhibit 2 to the proof of claim filed by the Secured Noteholder in each Debtor's bankruptcy case (the "Secured Noteholder Claim").

7.      To evidence their indebtedness under the Loan Agreement, on or about September 3, 2019, the Debtors executed and delivered to the Original Lender that certain Consolidated, Amended and Restated Promissory Note in the original principal amount of $14,200,000.00 (the

"Note").  A true and correct copy of the Note is annexed to the Secured Noteholder Claim as Exhibit 3.

8.      To secure payment of the Note, on or about September 3, 2019, the Debtors executed, acknowledged and delivered a mortgage (the "Mortgage") to the Original Lender.  The Mortgage granted a first mortgage lien on the Property and a security interest in the Debtors' personal property to the Original Lender. On September 6, 2019, the Original Lender duly recorded the Mortgage against the Property in the Office of City Register of the City of New York (the "City Register's Office") as City Register File Number ("CRFN") 2019000286575 and duly paid the mortgage recording taxes.  A true and correct copy of the Mortgage is annexed to the Secured Noteholder Claim as Exhibit 4.

9.      As additional collateral security for the payment of the Loan, the Debtors executed, acknowledged, and delivered to the Original Lender an Assignment of Leases and Rents dated as of September 3, 2019 (the "ALR") pursuant to which the Debtors, *inter alia*, granted to the Original Lender a security interest in all Leases and Rents (as defined in the Loan Agreement) generated by the Property, which includes all Hotel revenue. On September 6, 2019, the Original Lender duly recorded the ALR in the City Register's Office as CRFN 2019000286576.  *Id*.  A true and correct copy of the ALR is annexed to the Secured Noteholder Claim as Exhibit 5.

10.     The Original Lender further perfected its security interests in its collateral by filing UCC financing statements with the New York Secretary of State and New York City's Register Office with respect to the Debtors on September 3, 2019, bearing Filing Numbers 2019090930403150 and 2019090930403162, copies of which are annexed to the Secured Noteholder Claim as Exhibits 6 through Exhibit 9 (the "UCC Financing Statements").

11. By virtue of, *inter alia*, a series of allonges to the Note, assignments of the Mortgage, and assignments of the ALR, and assignments of the UCC Financing Statements, the Secured Noteholder acquired all of the right, title and interest in and to the Note, the Mortgage, the ALR, and the UCC Financing Statements and all related loan documents (collectively, the "Loan Documents").[1] Accordingly, Secured Noteholder is the current owner and holder of the Loan and the Loan Documents. True and correct copies of the aforementioned assignment documents are annexed to the Secured Noteholder Claim as <u>Exhibit 17</u> through <u>Exhibit 22.</u>

12. As of the Petition Date, the outstanding balance owed by the Debtors to the Secured Noteholder under the Loan was $21,360,127.58.

### The Debtor's Multiple Defaults under the Loan

13. By Notice of Event of Default and Demand for Payment, dated July 20, 2020, the Secured Noteholder, through its Special Servicer, notified the Debtors of their defaults under the Loan Documents.

14. By letter dated November 13, 2020 (the "Notice of Acceleration"), the Secured Noteholder accelerated all sums due and owing under the Loan Documents.

### The Foreclosure Action

15. On January 12, 2022, the Secured Noteholder commenced a foreclosure action (the "Foreclosure Action") against the Debtors and others before the United States District Court for the Southern District of New York (the "District Court") (Case No. 1:22-cv-00302302).

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning as ascribed in the Loan Documents.

#233108734_v3 527548.00038

**The District Court's Appointment of a Receiver and Debtor's Bankruptcy Filing**

16.     On March 10, 2022, the District Court entered an order (the "Receiver Order") in the Foreclosure Action, appointing Janus Hotel Management Services, LLC ("Janus") as receiver for the Property and Hotel.

17.     The Debtors responded to the Receiver Order by filing their bankruptcy petitions on the Petition Date.

**The Secured Noteholder's Motion to dismiss and Resolution Thereof**

18.     On April 26, 2022, the Secured Noteholder filed a motion to dismiss the Debtors' bankruptcy cases (the "Secured Noteholder Motion To Dismiss").

19.     On or about June 30, 2022, the Debtors and the Secured Noteholder entered into a stipulation resolving the Secured Noteholder Motion To Dismiss (the "Settlement Stipulation"), which was approved by the Court by order dated August 8, 2022.  [Dkt. No. 56].

20.     Pursuant to the Settlement Stipulation, *inter alia*, (i) David Nanosky was appointed manager of the Debtor; (ii) Janus was appointed the managing agent for the Debtors; (iii) the Secured Noteholder's claim was fixed and allowed as $21,360,127.58 as of the Filing Date; and (iv) the Debtors consented to the appointment of a broker chosen by the Secured Noteholder to market and sell the Debtors' assets.

**The Broker Retention Orders**

21.     By order dated, January 13, 2023, the Court authorized the Debtor's retention of Marcus & Millichap Real Estate Investments, Inc. ("Marcus") as broker to market the Debtors' assets for sale, which was amended by order, dated August 25, 2023 (the "Marcus Retention Order") [Dkt. No. 84, 120].

22.     By order dated August 25, 2023 (the "Hilco Retention Orders"), the Court authorized the Debtor's retention of Hilco Real Estate LLC ("Hilco") as co-broker with Marcus to market the Debtors' assets for sale [Dkt. No. 119].[2]

23.     As a result of the Broker Retention Orders, the Debtors' assets have been heavily marketed.

## The Purchase And Sale Agreement

24.      On December 14, 2023, the Debtor's entered into a purchase and sale agreement (the "Purchase And Sale Agreement") with Hudson West Hospitality, LLC (the "Stalking Horse") to sell the Debtors' Real Property, Personal Property and Intangible Property, each as defined in the Purchase And Sale Agreement (collectively, the "Sale Assets"), for $18,200,000, subject to higher and better offers.  A copy of the Purchase And Sale Agreement is annexed hereto as Exhibit 1.

25.     Pursuant to the Purchase And Sale Agreement, the Stalking Horse will assume the Debtors' obligations to the Secured Noteholder under the Loan as part of its purchase of the Sale Assets.

26.     The purchase price will be allocated 97% to the Owner Debtor, and 3% to the Operator Debtor.

## The Owner Debtor Plan

27.     Concurrently with the filing of this Motion, the Secured Noteholder and Owner Debtor filed the *Chapter 11 Liquidating Plan for 36th Street Property, Inc. Filed by the Secured Noteholder and 36th Street Property, Inc.* (the "Owner Debtor Plan") and the *Disclosure Statement Concerning the Chapter 11 Liquidating Plan for 36th Street Property, Inc. Filed By the Secured*

---

[2]     Marcus and Hilco are collectively referred to as the "Brokers."  The Marcus Retention Order and Hilco Retention Order are hereafter collectively referred to as the "Broker Retention Orders."

*Noteholder and 36th Street Property, Inc.* (the "Owner Debtor Disclosure Statement"), along with a motion seeking entry of an order conditionally approving the Owner Debtor Disclosure Statement and scheduling a combined final hearing on the Owner Debtor Disclosure Statement and confirmation hearing on the Owner Debtor Plan.

28.    The Owner Debtor Plan provides for the sale of substantially all of the Debtors' assets pursuant to the Owner Debtor Plan and this Motion, and the distribution of the proceeds from the sale allocated to the Owner Debtor's Assets to the Owner Debtor's creditors.

29.    The Owner Debtor Plan also provides language under Bankruptcy Code §1146(a) that transaction consummating the sale of the Sale Assets is exempt from transfer taxes otherwise applicable under New York State laws and New York City regulations.

30.    The Purchase And Sale Agreement is conditioned upon, *inter alia*, entry of an order of this Court confirming the Owner Debtor Plan.

**The Sale Of The Operator Debtor's Sale Assets Under Bankruptcy Code § 363**

31.    The Owner Debtor Plan does not govern the sale of those Sale Assets owned by the Operator Debtor, though confirmation of the Owner Debtor Plan is conditioned upon the sale of the Sale Assets belonging to the Operator Debtor to the same purchaser as for the Owner Debtor's Sale Assets.

32.    This Motion seeks authority to sell those Sale Assets belonging to the Operator Debtor pursuant to Bankruptcy Code § 363.

**The Court Should Enter an Order Establishing Procedures
for the Submission of Higher and Better Offers for the Sale Assets**

33.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor-in-possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor-in-possession must demonstrate a sound

business reason for a sale or use of assets outside the ordinary course of business. *See, e.g., In re Lionel Corp*, 722 F.2d 1063, 1071 (2d Cir. 1983).

34.    Pursuant to prior orders of this Court, the Debtors' assets have been extensively marketed for sale and a stalking horse has been identified who will purchase the sale assets for $18,200,000, subject to higher and better offers.  Based upon current market conditions and interests rates, which may change over time, a § 363 sale now is the best way for the Debtors to maximize the value of their assets for the benefit of creditors.  Additionally, the Secured Noteholder has agreed to a carve-out so that distributions may be made to creditors in this case.

35.    The Debtors and Secured Noteholder respectfully submit that Court should first enter an order in the form annexed hereto as <u>Exhibit 2</u>, establishing the procedures for the submission of any higher and better offers than the Stalking Horse's offer to purchase the Sale Assets as set forth in the Purchase And Sale Agreement. (the "Proposed Sale Procedure Order").

36.    It is the Debtors' duty to maximize the value of their bankruptcy estates, and the Proposed Sale Procedures Order is designed to fulfil this duty. *In re VCR I, L.L.C.*, 922 F.3d 323, 327 (5th Cir. 2019) ("A trustee has the duty to maximize the value of the estate."); *In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Atlanta Packaging Prod., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy sales and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoted by In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992)).

37.    The Debtors respectfully submit that this Motion and the Proposed Sale Procedures Order are compliant with Administrative Order No. 557 of this Court "Adoption of

8

Sale Guidelines," dated March 29, 2010 signed by Retired Chief Judge Carla E. Craig, U.S. Bankruptcy Judge for the U.S. Bankruptcy Court for the Eastern District of New York (the "Sale Guidelines"), as well as Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure, and Rules 6004-1 and 6005-1 of the Local Bankruptcy Rules for the Eastern District of New York (the "Local Rules") to the extent applicable and required.

38.     The Debtors believe that by providing for a fair, open and competitive bidding process upon receiving any timely Qualified Competing Offers, and by having the Stalking Horse set a floor price for the Sale Assets, the Proposed Sale Procedures Order will provide the greatest opportunity to maximize the value to the Debtors' estates.

39.     Specifically, the Proposed Sale Procedures Order provides the requirements for the submission of competing offers and consideration of those offers which are Qualified Competing Offers (as hereafter defined) for the Sale Assets.

40.     Under the Proposed Sale Procedures Order, the following requirements must be met in order for a competing offer ("Competing Offer") for the Sale Assets to be considered a qualified competing offer (a "Qualified Competing Offer"):

(a) **Deadline For Submitting Competing Offers.**  Except for the Secured Noteholder, all Competing Offers must be submitted in writing so that they are received by both counsel for the Debtors, counsel for the Secured Noteholder and Hilco, by hard copy or by email, on or before 5:00 pm (Eastern Time) three Business Days before the confirmation hearing date on the Owner Debtor Plan. (the "Competing Offer Deadline") at the following addresses:

**Counsel for the Debtor:**

Lawrence Morrison, Esq.
Robert Dakis, Esq.
Morrison Tenenbaum, PLC
87 Walker Street
New York, New York 10013
email: lmorrison@m-t-law.com
        rdakis@m-t-law.com

9

**Counsel for the Secured Noteholder:**

Keith M. Brandofino, Esq.
Bruce J. Zabarauskas, Esq.
Holland & Knight LLC
31 West 52nd Street
New York, New York 10019
email: keith.brandofino@hklaw.com
        bruce.zabarauskas@hklaw.com

**Hilco:**

Jeff Azuse
Hilco Real Estate, LLC
5 Revere Drive, Suite 410
Northbrook, IL 60062

(b) **Minimum Offer**.  The Competing Offer must be in excess of $18,200,000 by at least $50,000.00 (the "Minimum Bid") and submitted by the offeror (the "Competing Offeror") in the form of an executed purchase and sale agreement substantially in the form of the Purchase and Sale Agreement which is annexed to this Motion as <u>Exhibit 1</u>.  The purchase and sale agreement shall be executed by a duly authorized officer of the Competing Offeror, and accompanied by a red-lined document showing the differences between the Competing Offeror's proposed purchase and sale agreement, and the Purchase and Sale Agreement annexed to this Motion.

(c) **Offers For All Sale Assets Only**.  The Competing Offer must be for both the Owner Debtor Sale Assets and Operator Debtor Sale Assets. No offer for only the Owner Debtor Sale Assets or only the Operator Debtor Sale Assets or only a portion of such Sale Assets will be considered.

(d) **Deposit Upon Submission Of Competing Offer**.  Except for the Secured Noteholder, the Competing Offer must be accompanied by a seven hundred fifty thousand ($750,000) deposit to be transferred to counsel for the Debtor by wire transfer (the "Deposit") in accordance with the wiring instructions provided by Debtors' counsel. Each Deposit shall be held by Debtors' counsel in a non-interest bearing escrow account.

(e) **Financial Evidence**.  The Competing Offer must include written evidence of an irrevocable commitment for financing, without any contingency, or other satisfactory written evidence that the Competing Offeror has the financial ability to close and to pay the proposed purchase price in available funds no later than the Closing Date as defined below (the "Financial Evidence").

(f) **Provisions Of Purchase And Sale Agreement Regarding Assumption Of The Loan**.  Any provision of a Competing Offer which seeks to assume the Debtors'

10

obligations under the Loan Documents is subject to the Secured Noteholder's approval, in its sole and absolute direction. If the Secured Noteholder decides, in its sole and absolute discretion, to deny a Competing Offeror's proposed assumption of the Loan, then the Competing Offeror must pay the purchase price for the Sale Assets in cash on the Closing Date. For clarification purposes, as of the date of hereof, the Secured Noteholder has only approved the Stalking Horse's proposed assumption of the Debtors' obligations under the Loan Documents, subject to documentation approved by the Secured Noteholder and the Stalking Horse.

(g) **Proof Of Authority.** Any Competing Offer submitted by an Entity must be accompanied by a board resolution, written consent, or other similar document demonstrating the authority of the Competing Offeror to submit, execute, deliver and close the sale.

(h) **Required Certifications.** The Competing Offer must contain a certification signed by the Competing Offeror that its understands and agrees that: (i) is bound by the terms of the sale procedures set forth in Article VII of the Owner Debtor Plan and the Proposed Sale Procedures Order; (ii) it will act as Back-Up Bidder in the event that there is an Auction for the Sale Assets as provided in the Plan and the Sale Procedures Order and the Competing Offeror submits the second highest and best bid for the Sale Assets; (iii) it has completed any and all due diligence regarding the Sale Assets prior to the Competing Bid Deadline; (iv) there are no contingencies to its Competing Offer; (v) it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Sale Assets in making its bid; and (vi) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Sale Assets, or the completeness of any information provided in connection therewith or the Auction (as hereafter defined); and (v) it shall bear its own costs and expenses, including without limitation title costs.

(i) **Right Of Secured Noteholder To Credit Bid Without Deposit.** Subparagraphs (a) through (h) shall not apply to the Secured Noteholder, who shall conclusively be deemed to be a Qualified Competing Offeror and shall have the right pursuant to Bankruptcy Code § 363(k) to credit bid at the Auction (as hereafter defined) the full amount of its claim, without the need of making any Deposit; *provided, however*, that the Secured Noteholder's right to credit bid is conditioned upon the existence of a Qualified Competing Offer and if none shall exist, the Sale Assets shall be sold to the Stalking Horse, subject to approval by the Bankruptcy Court.

41.     The Proposed Sale Procedures Order further provides that if no Qualified Competing Offers are timely submitted to counsel for the Debtors, counsel for the Secured Noteholder, and Hilco, by the Competing Bid Deadline, then the Sale Assets shall be sold to the Staking Horse, pursuant to the Purchase and Sale Agreement, subject to entry of an order of this

Court confirming the Owner Debtor Plan, and an order of the Bankruptcy Court approving such sale, which orders shall be reasonably acceptable to the Stalking Horse and Secured Noteholder.

42.     If one or more Qualified Competing Offers are submitted by the Competing Offer Deadline, then an auction (the "Auction") of the Sale Assets shall take place in any reasonable manner that: (i) is not inconsistent with these procedures; and (ii) provides Competing Offerors that submitted Qualified Competing Offers with a fair opportunity to participate at the Auction, subject to the requirements set forth below.

(a) **Location And Date Of The Auction.** The Auction shall take place at the offices of Holland & Knight LLP, 31 West 52nd Street, New York, New York, 10019 at the date and at the time set forth in the Sale Procedures Order.

(b) **Who May Bid At Auction.** The Stalking Horse, the Secured Noteholder and those Competing Offerors that timely submitted a Qualified Competing Offer by the Competing Bid Deadline (each, a "Qualified Bidder") will be the only parties permitted to bid at the Auction. Hilco will notify all parties that submitted a Competing Offer by email whether or not they are Qualified Bidders at least two (2) business days prior to the Auction.

(c) **Mandatory Appearance At Auction.** Each Qualified Bidder must appear at the Auction through a duly authorized representative.

(d) **Conduct Of The Auction.** A representative of Hilco will conduct the Auction.

(e) **Initial Auction Bid.** The highest and best Qualified Competing Offer received by the Competing Bid Deadline will be the "Initial Auction Bid." Hilco will disclose the Initial Auction Bid to all Qualified Bidders by email at least two (2) Business Days prior to the Auction.

(f) **Commencement Of The Auction.** After the announcement of the Initial Auction Bid, Hilco will request additional bidding at the Auction.

(g) **Bidding Increments.** A Qualified Bidder, including the Secured Noteholder, may increase its bid as many times as it chooses, provided that each subsequent bid must exceed the prior bid, including the Initial Auction Bid, by at least $25,000.

(h) **Selection Of Winning Bidder.** The Auction will continue until a Winning Bidder and Back-Up Bidder are selected by the Secured Noteholder and Debtor. Prior to the conclusion of the Auction, the Secured Noteholder and Debtor will: (i) review each bid submitted at the Auction, on the basis, without limitation, of the amount of the purchase price, the likelihood of the bidder's ability to close the Sale by the Closing Date (as

12

hereafter defined) and the certainty of any financing, (ii) designate the highest and best bid received at the Auction for the Sale Assets (the "Winning Bid") and the Person making such bid as the Winning Bidder as the purchaser of the Sale Assets, subject to Bankruptcy Court Approval, and (iii) designate the next highest and best bid as the back-up bid (the "Back-Up Bid") and the party making such bid as the back-up bidder (the "Back-Up Bidder"), subject to Bankruptcy Court approval. Upon the designation of the Winning Bid, the Winning Bidder, the Back-Up Bid and the Back-Up Bidder, the Winning Bidder and the Back-Up Bidder shall initial, or otherwise confirm, appropriate changes or modifications to the Purchase and Sale Agreement to reflect the terms of their bids, as applicable. Upon the completion of such confirmation to the satisfaction of the Secured Noteholder, the Auction shall be concluded and no further bids shall be considered.

(i) **Back-Up Bidder.** As a condition to qualifying to participate in the Auction, the Stalking Horse and each Competing Offeror that submitted a Qualified Competing Bid shall be deemed to have consented to serve as a Back-Up Bidder The Back-Up Bidder shall be required to keep its Back-Up Bid open for acceptance and consummation up to and including ten (10) Business Days following the scheduled Closing Date (as hereafter defined), including any extensions thereof not to exceed twenty (20) days following the scheduled Closing Date after which such Back-Up Bidder shall be entitled to the return of the entirety of its Deposit; provided, however, that nothing else herein shall be deemed to modify or otherwise alter any other provision in the Purchase and Sale Agreement.

(j) **Hearing To Approve Winning Bid And Back-Up Bidder.** Subject to the Sale Procedures Order, a hearing to approve the sale of the Sale Assets to the Winning Bidder, or Back-Up Bidder if the Winning Bidder defaults on its Winning Bid, shall be held at the same date and time as the Confirmation Hearing on the Owner Debtor Plan.

(k) **Return Of Deposits/Closing Date And Back-Up Bidder Closing Date.** The Winning Bidder shall close on its bid no later than fourteen (14) days after being designated the Winning Bidder (subject to any extensions granted in writing by the Secured Noteholder), time being of the essence (the "Closing Date"). Except as otherwise provided in the Plan or the Proposed Sale Procedures Order, all Deposits shall be returned to each bidder at the Auction who is not selected as the Winning Bidder or the Back-Up Bidder by no later than the second (2nd) Business Day following the conclusion of the Auction. If the Successful Bidder closes on the Sale, the Deposit of the Back-Up Bidder shall be returned by Debtor's counsel to the Back-Up Bidder within ten (10) Business Days after the closing of the sale to the Winning Bidder. If the Winning Bidder fails to close Sale of the Property by the Closing Date (as it may be extended with the Secured Noteholder's written consent), then the Back-Up Bidder shall close on the Sale of the Property pursuant to its Back-Up Bid on a date that is no later than ten (10) Business Days, time being of the essence (subject to any extension of such closing date with the written consent of the Secured Noteholder) after it has been informed by email by Hilco that the Winning Bidder failed to close on the scheduled Closing Date (the "Back-Up Bidder Closing Date"). If the Winning Bidder (or the Back-Up Bidder, as applicable) fails to close on the applicable closing date or

otherwise defaults under the Purchase and Sale Agreement, the Debtors' counsel shall transfer the Winning Bidder's (or the Back-Up Bidder's, as applicable) Deposit to the Secured Noteholder who will be entitled to retain the Deposit as liquidated damages.

(l) **Liens Remaining In Effect.**  All liens, claims, encumbrances and interests upon the Sale Assets shall remain in effect until the closing of the Sale, and at closing shall be transferred and attached to the proceeds of the Sale to the same extent and priority that existed immediately before the closing.

**The Sale Procedures Order Should Schedule A Hearing for
Approval of the Sale Assets to the Purchaser for the Same Date and
Time as the Confirmation Hearing on the Owner Plan**

43.     The Proposed Sale Procedures Order also schedules a hearing (the "Final Sale Hearing") to consider entry of an order approving the sale of the Sale Assets (the "Sale") to the Purchaser (as hereafter defined).  The Debtors request that such hearing be held at the same date and time as the confirmation hearing on the Owner Debtor Plan.

**The Court Should Approve the Sale of the Sale Assets
Free of all Liens, Claims and Encumbrances**

44.     Following entry of the Proposed Sale Procedures Order, passage of the Competing Bids Deadline and any Auction conducted if one or more Qualified Competing Offers are submitted to counsel for the Debtor, counsel for the Secured Noteholder and Hilco by the Competing Bid Deadline, the Debtors respectfully submit that the Court should enter an order approving the sale of the Sale Assets to the following person or entity (the "Purchaser"):

(i)     the Stalking Horse if no Qualified Competing Offers are received by counsel for the Debtor, counsel for the Secured Noteholder and Hilco by the Competing Offer Deadline;

(ii)     the Winning Bidder (which for the avoidance of doubt could also be the Stalking Horse), if one or more Qualified Competing Offers are received by counsel for the Debtor, counsel for the Secured Noteholder and Hilco by the Competing Offer Deadline; or

(iii)     the Back-Up Bidder (which for the avoidance of doubt could also be the Stalking Horse) in the event that one or more Qualified Competing Offers are received by counsel for the Debtor, counsel for the Secured Noteholder and Hilco

by the Competing Offer Deadline, and the Winning Bidder (the "Purchaser") fails to close on its Winning Bid by the Closing Date.

45.     The sale of the Sale Assets shall be sold free and clear of all liens, claims encumbrances, and interests pursuant to Bankruptcy Code § 363(f), which liens, claims, encumbrances and interests shall upon closing attach to the proceeds of the Sale in the same order of priority that currently exist on the Sale Assets.[3]

46.     Section 363(f) of the Bankruptcy Code permits a debtor-in-possession to sell assets free and clear of all liens, claims, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets) provided that at least one or more of subsections (1) through (5) of § 363(f) are met. *See In re Takeout Taxi Holdings, Inc*., 307 B.R. 525, 529 (Bankr. E.D. Va. 2004); *In re Kellstrom Indus., Inc*., 282 B.R. 787, 793 (Bankr. D. Del. 2002).  The Debtors believe that they will be able to demonstrate at the sale hearing that it has satisfied one or more of these conditions.

---

[3] For purposes of clarity the Sale shall be free and clear of any unrecorded lease between Gemini 442 West 36th Street H, LLC, Gemini 442 West 36th Street 2, LLC, Gemini 442 West 36th Street 3, LLC, Gemini 442 West 36th Street 4, LLC, Gemini 442 West 36th Street 5, LLC, Gemini 442 West 36th Street 6, LLC, Gemini 442 West 36th Street 7, LLC, Gemini 442 West 36th Street 8, LLC, Gemini 442 West 36th Street 9, LLC, Gemini 442 West 36th Street 10, LLC, Gemini 442 West 36th Street 11, LLC, Gemini 442 West 36th Street 12, LLC, Gemini 442 West 36th Street 13, LLC, Gemini 442 West 36th Street 14, LLC, Gemini 442 West 36th Street 15, LLC, Gemini 442 West 36th Street 16, LLC, Gemini 442 West 36th Street 18, LLC, Gemini 442 West 36th Street 20, LLC, Gemini 442 West 36th Street 21, LLC, Gemini 442 West 36th Street 23, LLC, Gemini 442 West 36th Street 24, LLC, Gemini 442 West 36th Street 25, LLC, Gemini 442 West 36th Street 26, LLC, Gemini 442 West 36th Street 27, LLC, Gemini 442 West 36th Street 28, LLC, Gemini 442 West 36th Street 29, LLC, Gemini 442 West 36th Street 30, LLC, Gemini 442 West 36th Street 31, LLC, Gemini 442 West 36th Street 32, LLC, with Gemini 442 West 36th Street MT, LLC, dated January 14, 2008.

This is currently listed as an exception on the title report for the Real Property.  Counsel for the Secured Noteholder believes that this title exception, which pre-dates the Owner Debtor's acquisition of the Real Property is an error and is seeking to have it omitted by the title company.  Regardless, Bankruptcy Code § 363(f)((4) permits the sale of assets free and clear of an interest which is "in bona fide dispute."

#233108734_v3 527548.00038

47.     For example, § 363(f) permits a free and clear sale if non-bankruptcy law permits such sale free and clear, and § 363(f)(2) permits a free and clear sale if the holders of security interests or lien in the sale assets consent to such a Sale.

48.     Here, the Secured Noteholder, consents to a free and clear sale of the Sale Assets. Any liens senior to those of the Secured Noteholder will be paid in full at the Closing.

49.     Bankruptcy Code § 363(f)(3) provides that a sale may be free and clear of all liens, claims and encumbrances if "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property."

50.     Under Bankruptcy Code § 506, the value of a lien is equal to "the extent of the value of such creditor's interest in the estate's interest in such property."

51.     In the instant case, in the event that one or more Qualified Competing Offers are received for the Sale Assets, the Auction, and hence the ultimate purchase price, will determine the market value of the Assets and ultimately the value of any liens on such assets which are junior to the Secured Noteholder's liens.  As a result, Bankruptcy Code § 363(f)(3) is satisfied because the sales price will exceed the value of any liens on the Assets.

52.     The sale of the Sale Assets is without representation or warranties of any kind, nature or description by the Debtors.  The Sale Assets shall be transferred "as is," "where is" and "with all faults."   ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IS EXPRESSLY DISCLAIMED AND THERE SHALL BE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF THE SALE ASSETS OR ANY PORTION THEREOF.

**The Court Should Find that the Purchaser of the Sale Assets is a**
**Good Faith Purchaser within the Meaning of Bankruptcy Code § 363(m)**

#233108734_v3 527548.00038

53.     The Court's order approving the sale to the Purchaser following the Final Sale Hearing should also include a finding that the Purchaser is a good faith purchaser within the meaning of Bankruptcy Code § 363(m).

54.     Here, if the Sale Assets are sold to the Stalking Horse, a finding under Section 363(m) is appropriate because the Stalking Horse has acted in good faith within the meaning of Section 363(m).

55.     The Stalking Horse is not an "insider" of either of the Debtors as that term is defined by the Bankruptcy Code, the transaction has been proposed and if consummated with the Stalking Horse, entered into by the Debtors and the Stalking Horse without collusion, from arm's-length bargaining positions, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  As of the date of this Motion, neither the Debtors nor the Stalking Horse have engaged in any conduct that would cause or permit the transaction to be avoided under section 363(n) of the Bankruptcy Code.

### The Sale Order Shall Provide for the Payment of the Secured Noteholder Claim from the Operator Debtors Sale Proceeds, Subject to the Operator Debtor Carve Out Agreed to by the Secured Noteholder

56.     The Owner Debtor Plan provides for the distribution of the sale proceeds attributable to the Owner Debtor to creditors of the Owner Debtor.  Specifically, the Owner Debtor Plan provides that the sale proceeds attributable to the Owner Debtor will be used to pay: (i) all secured claims which are senior in priority to the Secured Noteholder in full (approximately $53,825); (i) the Owner Debtor's administrative and priority claims in full (approximately $635,554.500 in administrative expenses, including brokerage and U.S. Trustee fees and approximately $88,667 in non-administrative priority claims); and (iii) the Secured Noteholder's

#233108734_v3 527548.00038

secured claim except for a carve-out of $8,500 to be paid on a *pro rata* basis to holders of general unsecured claims of the of the Owner Debtor.

57.     Upon the Closing of the Sale, the Operator Debtor will no longer have a business to operate.  The Operator Debtor requests that the proposed Sale Order provide that at the closing of the Sale, the Sale Assets attributable to the Operator Debtor and all of the Secured Noteholder's cash collateral shall be paid to the Secured Noteholder on account of its allowed secured claim, except for a $55,000 carve out (the "Operator Debtor Carve Out") that the Secured Noteholder has agreed to for the benefit of creditors of the Operator Debtor, but only if this Court approves a sale of the Sale Assets and confirms the Owner Debtor Plan. The Operator Debtor shall hold the Operator Debtor Carve Out in its debtor-in-possession bank account, pending further order of the Court.

### Additional Extraordinary Provisions Pursuant to the Sale Guidelines and Local Rules

58.     The Debtors are seeking to have the sale of the Sale Assets to the Purchaser declared exempt from taxes under Bankruptcy Code §1146(a), and the proposed order approving of any sale of the Sale Assets and the Plan will specify the type of tax for which the exemption is sought in compliance with the Local Rules and Sale Guidelines.

59.     The proposed Sale Order may include findings limiting the Purchaser's successor liability.  The Debtors respectfully submit that notice of such a finding in this Motion is more than adequate as it is at least thirty (30) days from the hearing to consider entry of the Sale Order which will be the same time as the Court considers confirmation of the Plan.

60.     The proposed Sale Order may include a finding that the sale of the Sale Assets to the Purchaser does not constitute a fraudulent conveyance.  Here, where the Sale Assets are being sold altogether, but only in part pursuant to one debtor's plan of liquidation, the Purchaser should

not need to be concerned that in the future a creditor or trustee of the Operator Debtor or its estate could attempt to pursue a fraudulent conveyance action in connection with the Operator Debtor's assets. This is a fairly unique situation in that regard and the Purchaser is therefore entitled to such a finding.

61.     The Sale Order may seek relief from the stay imposed by Bankruptcy Rule 6004(h) and that is warranted under the circumstances. For example, if the Purchaser is the Stalking Horse, the parties should be able to immediately work towards consummating the sale which includes the Stalking Horse's assumption of the debt owed to the Secured Noteholder. If the parties are forced to wait for the stay to expire, it will further delay the Closing without justification. Here the Stalking Horse has proceeding in good faith, without any bidding or buyer protections which are customary for a stalking horse buyer in an effort to allow this sale process to proceed expeditiously and without additional delay and expense.

62.     The Debtors will provide evidence at the Sale Hearing necessary to justify and warrant the findings highlighted herein to the extent they are requested in the proposed Sale Order.

63.     Accordingly, the Debtors respectfully request that the Court: (i) enter the Sale Procedures Order annexed hereto as <u>Exhibit 2</u>; (ii) schedule a hearing to approve the sale of the Sale Assets to the Purchaser for the same date and time as the confirmation hearing on the Owner Debtor Plan; and (iii) at the final sale hearing, enter an order approving the sale of the Sale Assets to the Purchaser, finding the Purchaser to be a good faith purchaser within the meaning of Bankruptcy Code §363(m) and providing that the payment of the sale proceeds attributable to the Operator Debtor and cash collateral of the Operator Debtor to the Secured Noteholder minus the Operator Debtor Carve Out, with the distribution of the sale proceeds attributable to the Owner Debtor to be made pursuant to the Owner Debtor Plan.

#233108734_v3 527548.00038

Dated:  December 15, 2023.

                        Respectfully submitted,

                        MORRISON TENENBAUM

                        By: <u>/s/ Lawrence Morrison</u>
                             Lawrence Morrison
                        87 Walker Street, Floor 2
                        New York, New York 10013
                        (212) 620-0938
                        rd@morr-law.com

                        Attorneys for the Debtors

#233108734_v3 527548.00038

# Exhibit 1

**Execution Version**

# PURCHASE AND SALE AGREEMENT

by and among

**36th Street Property Inc**,
a New York corporation

and

**HR 442 Corp.**,
a New York corporation

and

**Hudson West Hospitality LLC**,
a New York limited liability company

Property Name:  Hudson River Hotel
Location:  442 West 36th Street, New York, New York  10018

Effective Date:  December 14, 2023

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE 1 - CERTAIN DEFINITIONS ..................................................................................... 1

ARTICLE 2 - SALE OF PROPERTY ........................................................................................... 4

ARTICLE 3 - TITLE MATTERS.................................................................................................. 5

ARTICLE 4 - AS-IS SALE .......................................................................................................... 5

ARTICLE 5 - ADJUSTMENTS AND PRORATIONS ................................................................ 7

ARTICLE 6 - CLOSING............................................................................................................. 11

ARTICLE 7 - REPRESENTATIONS AND WARRANTIES .................................................... 15

ARTICLE 8 - COVENANTS ...................................................................................................... 17

ARTICLE 9 - DEFAULTS.......................................................................................................... 20

ARTICLE 10 - CASUALTY/CONDEMNATION ..................................................................... 20

ARTICLE 11 - MISCELLANEOUS .......................................................................................... 21

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") is made to be effective as of December 14,2023 (the "<u>Effective Date</u>") by and between **36th Street Property Inc**, a New York corporation ("<u>Owner</u>"), and **HR 442 Corp.**, a New York corporation("<u>Operator"</u>, Owner and Operator together are referred to herein as, "<u>Seller</u>"), and **Hudson West Hospitality LLC**,a New York limited liability company ("<u>Buyer</u>").

## *W I T N E S S E T H :*

In consideration of the mutual covenants and agreements set forth herein the parties hereto do hereby agree as follows:

## ARTICLE 1 - CERTAIN DEFINITIONS

In addition to terms defined elsewhere in this Agreement, as used herein, the following terms shall have the following meanings:

"<u>Bankruptcy Case</u>" shall mean the jointly administered bankruptcy cases of 36th Street Property Inc and HR 442 Corp. Case Nos. 22-40563 and 22-40562 pending in the United States Bankruptcy Court for the Eastern District of New York.

"<u>Broker</u>" shall mean Marcus & Millichap.

"<u>Business Day</u>" shall mean any day other than Saturday, Sunday, any Federal holiday, or any holiday in the State in which the Real Property is located.  If any period expires or action is to be taken on a day which is not a Business Day, the time frame for the same shall be extended until the next Business Day.

"<u>Buyer's Representatives</u>" shall mean Buyer and any officers, directors, employees, agents, consultants, representatives and attorneys of Buyer or any direct or indirect owner of any beneficial interest in Buyer, but only if the same conduct due diligence or are otherwise involved in the Transaction.

"<u>Closing</u>" shall mean the closing of the Transaction.

"<u>Closing Date</u>" shall mean the day that the Transaction closes, which shall not be later than the Scheduled Closing Date.

"<u>Closing Documents</u>" shall mean all documents executed and delivered by Buyer or Seller as required by <u>Section 6.2</u> and <u>Section 6.3</u> or as otherwise executed and delivered by Buyer or Seller as part of the Closing.

"<u>Contracts</u>" shall mean the contracts, equipment leases, and other agreements relating to the Real Property.

"<u>deemed to know</u>" (or words of similar import) shall have the following meaning:  Buyer and the Buyer's Representatives shall be "<u>deemed to know</u>" any fact, circumstance or

information or shall have "deemed knowledge" of the same to the extent (a) any Buyer's Representative has actual knowledge of a particular fact or circumstance or information that is inconsistent with any Seller's Warranty, or (b) this Agreement, the Closing Documents executed by Seller, the documents and materials with respect to the Property delivered or made available to any Buyer's Representative in connection with the Transaction, or any reports prepared or obtained by any Buyer's Representatives in connection with Buyer's due diligence discloses a particular fact or circumstance or contains information which is inconsistent with any Seller's Warranty. For purposes of this Agreement, documents and materials shall be deemed to have been "made available" to Buyer's Representatives only if the same are located at a designated physical or on-line location to which Buyer's Representatives have been provided access.

"Deposit" shall mean the sum of Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00), to the extent Buyer deposits the same in accordance with the terms of Section 2.1, together with any interest earned thereon, if applicable.

"Escrow Agent" shall mean the Disbursing Agent as defined in the Plan, unless otherwise designated in accordance with the Plan.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"FF&E & CapEx Deposit" shall mean an amount equal to Five Hundred Thousand Dollars and 00/100 ($500,000.00).

"Hotel" shall mean the hotel operated on the Real Property.

"Laws" shall mean all municipal, county, State or Federal statutes, codes, ordinances, laws, rules or regulations.

"Liabilities" shall mean, collectively, any and all conditions, losses, costs, damages, claims, liabilities, expenses, demands or obligations of any kind or nature whatsoever.

"Permitted Exceptions" shall mean and include all of the following, except for any liens to attach instead to the proceeds of such sale pursuant to section 363(f) of the Bankruptcy Code as provided in the Plan and Sale Order: (a) all agreements, covenants, restrictions, conditions, reservations, and other matters of record,(b) any and all present and future laws, regulations, restrictions, requirements, ordinances, resolutions and orders of governmental entities affecting the Real Property (including, without limitation, any of the foregoing relating to zoning, building, environmental protection and the use, occupancy, subdivision or improvement of the Real Property) and any violations thereof, (c) any state of facts (including, without limitation, those relating to the physical condition or variations in location or dimension) that would be disclosed by a current survey of the Real Property, (d) all liens for real estate taxes, school taxes, special assessments, district charges, water and sewer taxes, rents and charges, and other governmental charges and impositions, provided Seller pays all open taxes and charges due up until the Closing Date and obtains a final water and sewer reading as of the Closing Date, and(e) the standard printed exceptions, and exclusions to coverage, set forth in the form of title policy utilized by the applicable title company. Notwithstanding

any provision to the contrary contained in this Agreement or any of the Closing Documents, any or all of the Permitted Exceptions may be omitted by Seller in the Deed (as hereinafter defined) without giving rise to any liability of Seller, irrespective of any covenant or warranty of Seller that may be contained in the Deed (which provisions shall survive the Closing and not be merged therein).

"<u>Plan</u>" shall mean that certain Chapter 11 Liquidating Plan for 36th Street Property Inc filed by Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of UBS Commercial Mortgage Trust 2019-C17, Commercial Mortgage Pass-Through Certificates, Series 2019-C17 and36th Street Property Inc in the Bankruptcy Case.

"<u>Property</u>" shall mean, collectively, (a) the Real Property, (b) the "<u>Personal Property</u>" as defined in the Bill of Sale attached hereto as **Exhibit C**, and (c) the "<u>Intangible Property</u>" as defined in the Assignment Agreement attached hereto as **Exhibit D**, but specifically excluding any Protected Information.  For avoidance of doubt, Seller shall not assign, and Buyer shall not assume, any of the Contracts as part of the Transaction.

"<u>Protected Information</u>" shall mean any books, records or files (whether in a printed or electronic format) that consist of or contain any of the following:  Seller's organizational documents or files or records relating thereto; appraisals; budgets; strategic plans for the Property; internal analyses; information regarding the marketing of the Property for sale; submissions relating to obtaining internal authorization for the sale of the Property by Seller or any direct or indirect owner of any beneficial interest in Seller; attorney and accountant work product; attorney-client privileged documents; internal correspondence of Seller, any direct or indirect owner of any beneficial interest in Seller, or any of their respective affiliates and correspondence between or among such parties; or other information in the possession or control of Seller or any direct or indirect owner of any beneficial interest in Seller which such party reasonably deems confidential, proprietary, or privileged.

"<u>Real Property</u>" shall mean the real estate owned by the Owner legally described in **Exhibit A** attached hereto, together with all improvements and fixtures located thereon and owned by Seller as of the Closing and any rights, privileges and appurtenances pertaining thereto.

"<u>Sale Order</u>" shall mean the final and non-appealable order of the Bankruptcy Court approving the sale of the Property to Buyer and the closing of the Transaction, free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code section 363(f), with any such liens, claims, and encumbrances to attach to the proceeds of such sale, such order to be in form and substance reasonably acceptable to the Buyer prior to submission to the Bankruptcy Court.

"<u>Scheduled Closing Date</u>" shall mean the date that is thirty (30) days after the Sale Order shall have been entered; provided, however that Buyer shall have the one time right to extend such date by an additional thirty (30) days by giving written notice thereof to Selleron or before five (5) Business Days prior to the initial Scheduled Closing Date.

"Secured Noteholder" shall mean Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of UBS Commercial Mortgage Trust 2019-C17, Commercial Mortgage Pass-Through Certificates, Series 2019-C17.

"Seller Parties" shall mean and include, collectively, (a) Seller; (b) its counsel; (c) Broker; (d) any direct or indirect owner of any beneficial interest in Seller; (e) any officer, director, employee, or agent of Seller, its counsel, Broker, or any direct or indirect owner of any beneficial interest in Seller; and (f) any other entity or individual affiliated or related in any way to any of the foregoing.

"Seller's Warranties" shall mean Seller's representations and warranties set forth in Section 7.2 and the Closing Documents executed by Seller for the benefit of Buyer, as such representations and warranties may be deemed modified or waived by Buyer pursuant to the terms of this Agreement.

"Transaction" shall mean the transaction contemplated by this Agreement.

## ARTICLE 2 - SALE OF PROPERTY

Subject to the terms of this Agreement, the Closing Documents, the Plan and the Sale Order, Seller agrees to sell and Buyer agrees to purchase all of Seller's right, title and interest in and to the Property.Further, notwithstanding any provision herein to the contrary, this Agreement shall be subject to higher and better offers pursuant to the Plan.  In consideration therefor, Buyer shall pay to Seller the sum of Eighteen Million Two Hundred Thousand and 00/100 Dollars ($18,200,000.00) (the "Purchase Price").  The Purchase Price shall be paid as follows:

2.1     Payment of Deposit and FF&E & CapEx Deposit.  Upon Buyer's execution of this Agreement, and as a condition precedent to the effectiveness of this Agreement, Buyer shall pay (a) the Deposit to Escrow Agent, and (b) the FF&E & CapEx Deposit to Escrow Agent, both in immediately available funds by wire transfer.

2.2     Applicable Terms; Failure to Make Deposit.  Subject to Section 2.1, the Deposit shall be paid to Escrow Agent in immediately available funds by wire transfer in accordance with the wire instructions provided by Escrow Agent.  Except as expressly otherwise set forth herein, the Deposit shall be applied against the Purchase Price at the Closing and shall otherwise be held and delivered by Escrow Agent in accordance with the provisions of **Exhibit B** attached hereto.  Notwithstanding any provision in this Agreement to the contrary, if Buyer fails to timely make the Deposit as provided herein, Seller may elect to terminate this Agreement, in which event the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Agreement.

2.3     Cash at Closing.  On the Scheduled Closing Date, Buyer shall (a) deposit into escrow with the Escrow Agent an amount equal to the balance of the Purchase Price in immediately available funds by wire transfer as more particularly set forth in Section 6.1, as prorated and adjusted as set forth in Article 5, Section 6.1, or as otherwise provided under this Agreement,and (b) authorize and direct the Escrow Agent to simultaneously pay the Deposit into such escrow.

2.4     <u>Allocation of Purchase Price to Personalty</u>.  The parties hereto acknowledge and agree that the allocation of the Purchase Price attributable to the Real Property and the Personal Property shall be as set forth on **Exhibit F** attached hereto, and the parties agree that such allocation represents the parties' good faith judgment as to the fair market value of the Property. Seller and Buyer shall file all federal tax returns, in accordance with such allocation and in accordance with Section 1060 of the Code and the regulations promulgated thereunder.  To the extent applicable, Buyer shall pay any and all State of New York and City of New York sales and/or compensating use taxes imposed upon or due in connection with the Transaction contemplated hereunder under applicable Laws.  Buyer shall file all necessary tax returns, if any, with respect to all such taxes and, to the extent required by applicable law, Seller will join in the execution of any such tax returns.  The provisions of this <u>Section 2.4</u> shall survive the Closing.

## ARTICLE 3 - TITLE MATTERS

At Closing, title to the Property shall be transferred to Buyer subject to the Permitted Exceptions.

## ARTICLE 4 - AS-IS SALE

4.1     <u>As-Is Provisions</u>.

4.1.1     <u>As-Is Sale</u>.  Buyer acknowledges and agrees that:

(a)     The Property shall be sold, and Buyer shall accept possession of the Property as of the Closing, "AS IS, WHERE IS, WITH ALL FAULTS", with no right of setoff or reduction in the Purchase Price.

(b)     Except for Seller's Warranties, none of the Seller Parties shall be deemed to have made any verbal or written representations, warranties, promises or guarantees (whether express, implied, statutory or otherwise) to Buyer with respect to the Property, any matter set forth, contained or addressed in the materials delivered or made available to Buyer's Representatives, including, but not limited to, the accuracy and completeness thereof.

(c)     Buyer has independently confirmed to its satisfaction all information that it considers material to its purchase of the Property or the Transaction.

4.1.2     <u>Release</u>.  By accepting the Deed and closing the Transaction, Buyer, on behalf of itself and its successors and assigns, shall thereby release each of the Seller Parties from, and waive any and all Liabilities against each of the Seller Parties for, attributable to, or in connection with the Property, whether arising or accruing before, on or after the Closing and whether attributable to events or circumstances which arise or occur before, on or after the Closing, including, without limitation, the following:  (a) any and all statements or opinions heretofore or hereafter made, or information furnished, by any Seller Parties to any Buyer's Representatives; and (b) any and all Liabilities with respect to the structural, physical, or environmental condition of the Property, including, without limitation, all Liabilities relating to the release, presence, discovery or removal of

any hazardous or regulated substance, chemical, waste or material that may be located in, at, about or under the Property, or connected with or arising out of any and all claims or causes of action based upon CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§9601 *et seq*., as amended by SARA (Superfund Amendment and Reauthorization Act of 1986) and as may be further amended from time to time), the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§6901 *et seq*., or any other Federal, State or municipal Laws relating to environmental contamination, or any other related claims or causes of action (collectively, "<u>Environmental Liabilities</u>"); and (c) any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to any portion of the Property. Notwithstanding the foregoing, Buyer shall not be liable nor shall Seller be released from any claims or actions brought by third parties against the Seller and which arose prior to the Closing.

4.1.3    <u>Assumption of Liability</u>.    By accepting the Deed and closing the Transaction, Buyer shall thereby assume and take responsibility and liability for the following:  (a) any and all Liabilities attributable to the Property to the extent that the same arise or accrue on or after the Closing and are attributable to events or circumstances which arise or occur on or after the Closing; and (b) any and all Liabilities with respect to the structural, physical or environmental condition of the Property, whether such Liabilities are latent or patent, whether the same arise or accrue before, on or after the Closing, and whether the same are attributable to events or circumstances which may arise or occur before, on or after the Closing, including, without limitation, all Environmental Liabilities; and (c) any and all Liabilities that arose or accrued prior to the Closing or are attributable to events which arose or occurred prior to the Closing, but only if Buyer is deemed to know about the same on or before the Closing; and (d) any and all Liabilities with respect to which Buyer receives a credit at Closing, but only to the extent of such credit.  Buyer acknowledges and agrees that the Liabilities to be assumed by Buyer pursuant to each of the foregoing clauses are intended to be independent of one another, so Buyer shall assume Liabilities described in each of the clauses even though some of those Liabilities may be read to be excluded by another clause.  Notwithstanding the foregoing, (i) any tort or governmental claims brought with respect to the Property, to the extent that the same arises or accrues as a result of any injury that occurred prior to the Closing, and (ii) any Liabilities arising as a result of a Seller default under any contractual agreements pertaining to the Property during Seller's period of ownership, shall be retained by Seller and not be assumed by Buyer as a result of <u>clause (b)</u> or <u>clause (c)</u> unless the same are caused by the acts or omissions of any Buyer's Representatives. Notwithstanding the foregoing, Buyer shall not be liable nor shall Seller be released from any claims or actions brought by third parties against the Seller and which arose prior to the Closing.

4.1.4    <u>Successors and Assigns</u>.    The provisions of this <u>Section 4.1</u> shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

4.1.5    <u>Reaffirmation and Survival</u>.    The provisions of this <u>Section 4.1</u> shall be deemed reaffirmed by Buyer by acceptance of the Deed and shall survive the Closing.

4.2    <u>Limitation on Seller's Liability</u>.

        4.2.1    <u>Maximum Aggregate Liability</u>.    Notwithstanding any provision to the contrary contained in this Agreement or the Closing Documents, the maximum aggregate liability of the Seller Parties, and the maximum aggregate amount which may be awarded to and collected by Buyer, in connection with the Transaction, the Property, under this Agreement, and under all Closing Documents (including, without limitation, in connection with the breach of any of Seller's Warranties for which a claim is timely made by Buyer) shall not exceed Fifty Thousand Dollars ($50,000.00).

        4.2.2    <u>Survival</u>.  The provisions of this <u>Section 4.2</u> shall survive the Closing (and not be merged therein) or any earlier termination of this Agreement.

## ARTICLE 5 - ADJUSTMENTS AND PRORATIONS

        The following adjustments and prorations shall be made at Closing.  Except as otherwise expressly provided in this Agreement, all income and expenses of the Property shall be prorated between Seller and Buyer as of 12:01 a.m. Eastern Time on the Closing Date (the "<u>Cut-Off Time</u>"), so that all income and expenses of the Property with respect to the period prior to the Cut-Off Time shall be for the account of Seller and all income and expenses of the Property with respect to the period after the Cut-Off Time shall be for the account of Buyer.  All prorations shall be based on a working capital balance of zero for the hotel at Closing and normal levels of supplies and consumable inventories for the hotel in accordance with past practices. Any reference in this <u>Article 5</u> to payments made or cash being received by Seller shall also include any such items which are made or received by Manager on behalf of Seller prior to Closing. Moreover, any reference in this <u>Article 5</u> to payments made or cash being received by Buyer shall also include any such items which are made or received by Buyer's property manager on behalf of Buyer after Closing.  No items of income or expense are to be included more than once in determining the prorations and payments under this Article.  Seller and Buyer shall be responsible for computing all such prorations in the manner hereafter set forth.

5.1    <u>Income</u>.

        (a)    Seller shall be entitled to all rents and all other revenues of any kind attributable to any period prior to the Cut-Off Time (or, in the case of any facility (an "<u>Operating Facility</u>") which closes after the Cut-Off Time, the time that such Operating Facility closes on the Closing Date) under all food service, bar, beverage and liquor revenues and charges and all revenues and charges from restaurant operations, hotel banquet and conference facility operations, and other revenue of any kind attributable to any of the same.  Buyer shall be entitled to all rents and all other revenues of any kind attributable to any period after the Cut-Off Time (or, in the case of any Operating Facility which closes after the Cut-Off Time, after such time as such Operating Facility closes on the Closing Date) under all food service, bar, beverage and liquor revenues and charges and all revenues and charges from restaurant operations, hotel banquet and conference facility operations, and all other revenue of any kind attributable to any of the same.

(b)    Seller shall receive and be entitled to all room and other revenues, charges and receivables from the hotel rooms at the Property, and other revenues otherwise arising from guests and customers of the Hotel (collectively, "Hotel Room Revenues"), through check-out time for the Hotel on the day immediately prior to the Closing Date.  Buyer shall receive and be entitled to all Hotel Room Revenues from and after check-out time for the Hotel on the Closing Date.  From check-out time for the Hotel on the calendar day immediately preceding the Closing Date through and including check-out time on the Closing Date, Buyer and Seller shall each be entitled to one-half (1/2) of the Hotel Room Revenues for such twenty-four (24) hour period.  At Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, at face value:  (i) all petty cash funds in the hands of Seller in connection with the hotel guest operations at the Hotel; and (ii) the guest accounts receivable payable by guests with valid charge card authorizations on file as of the check-out time for the Hotel on the Closing Date (based on guests and customers using the Hotel) both (A) in occupancy from the preceding night through check-out time the morning of the Closing Date; and (B) previously in occupancy prior to check-out time on the Closing Date.  For purposes of this Agreement, transfer or sale at face value shall have the following meanings:  (X) for petty cash an amount equal to the total of all petty cash funds on hand; and (Y) for the guest accounts receivable, the total of all such accounts receivable as shown on the records of the Hotel, less accounting charges for rooms furnished on a gratuity or complementary basis to any hotel staff or as an accommodation to other parties, and less Buyer's pro rata share (50%) of Hotel Room Revenues for the twenty-four (24) hour period from check-out time on the calendar day immediately preceding the Closing Date through and including check-out time on the Closing Date.  The purchase price of said petty cash fund and guest accounts receivable, as determined above, and the amount of the accounts receivable shall be paid to Seller at the Closing by a credit to Seller on the Closing Statement in the computation of the adjustments and prorations on the Closing Date.  If the amount of the credit due to Seller exceeds the amount of any credit due to Buyer, Buyer shall pay such amount in excess of the amount of the credit to Buyer with the payment of the Purchase Price.  Seller shall provide Buyer a credit against the Purchase Price in an amount equal to all guest reservation deposits, complimentary room nights, any form of compensation or award given to guests as a result of guest complaints (to the extent that the same have not been paid in full prior to Closing), "trade-outs" and gift certificates (as set forth on the Hotel balance sheets as current liabilities) held by the Hotel for hotel guests arriving after check-out time for the Hotel on the Closing Date or thereafter.  Buyer shall be liable for such deposits, complimentary room nights, any form of compensation or award given to guests as a result of guest complaints, "trade-outs" and gift certificates after the Closing, and does hereby indemnify and hold harmless Seller, and Seller's officers, directors, employees and agents from and against any loss, cost, claim or expense (including but not limited to attorneys' fees) resulting from any claim for such reservation deposits or gift certificates, which indemnity shall survive Closing.  Any furniture, fixtures or equipment reserve held for the Property shall be Seller's at Closing.

(c)     At Closing Seller shall assign to Buyer the accounts receivable (less any reserves for bad debt as reasonably determined by Seller based upon sound accounting principles and the history of the Property) with respect to the Property for which Buyer shall be obligated to pay to Seller at Closing an amount equal to all accounts receivable as shown on the books of the Property as of the Closing Date.

(d)     The Purchase Price includes all supplies and consumables.  Seller shall transfer to Buyer, and Buyer shall purchase from Seller, without any additional amounts owing, all of the reserve stocks of supplies and consumables consisting of food and beverage (including alcoholic and nonalcoholic) items, whether opened or unopened, to the extent permitted by applicable Law.

(e)     Seller shall cause the applicable vending companies to service the vending machines at the Property on the morning of Closing.  All commissions due to Seller from such vending companies based on the amount of vending proceeds as of the Cut-Off Time shall be paid to and belong to Seller.  In the event that Seller is unable to cause the applicable vending companies to service the vending machines at the Property immediately prior to Closing, Buyer and Seller will prorate the income associated therewith based upon reasonable estimates.

5.2     Trade Payables.  For purposes of this Agreement, the term "trade payables" shall mean any open accounts payable to trade vendors or suppliers of the Hotel, restaurant, bar or similar facilities at the Property selling goods, food, beverages or services to the general public for final use or consumption (i.e., retail trade).  Seller agrees that it shall be debited in the prorations set forth herein for all trade payables from the Property for goods received at or services supplied to the Property on or prior to the Cut-Off Time.  Buyer agrees that it shall be charged with all trade payables from the Property for goods received at or services supplied to the Property after the Cut-Off Time and reasonably ordered by Seller in the ordinary course of business prior to the Closing Date, and in any event for all such goods and services accepted by Buyer, and shall and hereby does indemnify and hold Seller and Seller's officers, directors, employees and agents harmless from payment of the same, which indemnity shall survive the Closing.

5.3     Proration of Taxes and Other Property Expenses.Notwithstanding any provision herein to the contrary, all outstanding (a) general real estate and *ad valorem* taxes and other state, county or municipal taxes, charges and assessments, including without limitation any special assessments, (b) electricity, gas, water, sewer and telecommunication fees, and (c) license and permits feesaffecting the Property that are due after the Closing Date will be the responsibility of Buyer and Seller shall be responsible for all amounts due up to the Closing Date.

5.4     Closing Costs.  Closing costs shall be allocated between Buyer and Seller in accordance as follows:

(a)     Buyer shall pay the following closing costs:  (i) all premiums and charges of the title company in connection with any owner's title policy and any endorsements to the such title policy requested by Buyer, (ii) the cost of any survey of the Real Property ordered by Buyer, (iii) all sales taxes or fees incurred

in connection with the Transaction to the extent applicable, (iv) all recording and filing charges in connection with the instrument by which Seller conveys the Property, (v) all escrow and closing charges, (vi) the commission due any broker representing Buyer, (vii) all fees due its attorneys, (viii) all costs of Buyer's due diligence, including fees due its consultants, and (ix) all lenders' fees, mortgage taxes, and similar charges, if any, related to any financing to be obtained by Buyer.

(b)     Seller shall pay the following closing costs pursuant to the Plan and Sale Order: (i) the commission due Broker, (ii) all fees due its attorneys,(iii) any liens, judgments or warrants appearing on the title policy against Seller or a prior owner which are senior in priority to Secured Noteholder's claim or would not otherwise be a Permitted Encumbrance, and (iv) any NYC or NYS real property transfer taxes, if any.

The obligations of the parties under this section shall survive the Closing (and not be merged therein) or any earlier termination of this Agreement.

Buyer acknowledges and agrees that any sales taxes due and payable at Closing on the net book value of the Personal Property shall be a Buyer cost and Buyer shall solely be liable for the payments of any such sales taxes.

5.5     <u>Cash Security Deposits; Reservation Deposits</u>.  At Closing, Seller shall give Buyer a credit against the Purchase Price in the aggregate amount of any advance deposits then held by Seller with respect to the Property pursuant to the terms of any reservations of rooms or banquet or other facilities.  All advance booking deposits as of the Closing Date for the Property for which Buyer receives a credit shall be the obligation of Buyer after Closing.  There shall be no post-Closing Date adjustment based on the amounts actually earned or refunded by Buyer with respect to or on account of advance bookings, regardless of whether Buyer's obligations with respect thereto shall be greater or less than the amount credited to Buyer pursuant to this section.

5.6     <u>Cash on Hand</u>.  Except for the petty cash funds to be sold to Buyer and the guest reservation deposits, gift certificates, complimentary room nights, any form of compensation or award given to guests as a result of guest complaints (to the extent that the same have not been paid in full prior to Closing), and "trade-outs" to be credited or delivered to Buyer, all cash, check and other funds pertaining to or arising from the Property (whether held in hand at the Property or in deposits with banks or other financial institutions) as of the Closing Date (including any amounts held in reserve for furniture, fixtures and equipment or for other purposes) shall remain the sole property of Seller and are not included in the purchase and sale of the Property under this Agreement.

5.7     <u>Wages and Salaries</u>.  Seller shall pay, or cause to be paid, the wages and salaries and other benefits of employment including all earned vacation pay through the Cut-Off Time, together with any applicable employment and withholding taxes, applicable to the employees of the Property to the extent that the same accrue as a result of such employees' employment prior to the Cut-Off Time.From and after the date upon which the Sale Order has been entered, Seller shall permit Buyer or its affiliates an opportunity to conduct interviews of existing employees

upon reasonable notice, during normal business hours and provided that such interviews are conducted in the presence of Seller's current property manager.

5.8    <u>Final Allocation</u>.    There shall be no post-Closing Date adjustment of the adjustments and pro-rations made pursuant to this Article 5.  The provisions of this section shall survive the Closing and not be merged therein.

## ARTICLE 6 - CLOSING

6.1    <u>Closing Mechanics</u>.

(a)    The parties shall conduct an escrow-style closing through the Escrow Agent so that it will not be necessary for any party to attend the Closing.

(b)    Provided all conditions precedent to Seller's obligations hereunder have been satisfied, Seller agrees to convey the Property to Buyer upon confirmation of receipt of the Purchase Price by the Escrow Agent as set forth below.  Provided all conditions precedent to Buyer's obligations hereunder have been satisfied, Buyer agrees to pay the amount specified in <u>Section 2.3</u> by timely delivering the same to the Escrow Agent on the Scheduled Closing Date and unconditionally authorizing and directing the Escrow Agent no later than 2:00 noon Eastern Time on the Scheduled Closing Date to deposit the same in accordance with the Plan and Sale Order as to the proceeds from the Transaction.

(c)    The items to be delivered by Seller or Buyer in accordance with the terms of <u>Sections 6.2</u> or <u>6.3</u> shall be delivered to Escrow Agent no later than 5:00 p.m. Eastern Time on the last Business Day prior to the Scheduled Closing Date except that (i) the items in the paragraph entitled "Keys and Original Documents" shall be delivered by Seller at the Property or made available for pick-up on the Closing Date, and (ii) the Purchase Price shall be delivered by Buyer in accordance with the terms of <u>Section 6.1(b)</u>.

6.2    <u>Seller's Closing Deliveries</u>.  At Closing, Seller shall deliver the following:

(a)    <u>Deed</u>.  A recordable special warranty deed ("<u>Deed</u>") subject to the Permitted Exceptions, executed and acknowledged by Owner.

(b)    <u>Bill of Sale</u>.  A bill of sale in the form of **<u>Exhibit C</u>** attached hereto, executed by Operator.

(c)    <u>Assignment Agreement</u>.  An assignment and assumption of the Intangible Property, in the form of **<u>Exhibit D</u>** attached hereto ("<u>Assignment Agreement</u>"), executed by each Seller.

(d)    <u>Non-Foreign Status Affidavit</u>.  A non-foreign status affidavit in the form of **<u>Exhibit E</u>** attached hereto, as required by Section 1445 of the Internal Revenue Code, executed by each Seller.

(e)  <u>Evidence of Authority</u>.  Reasonable documentation to establish the due authorization of Seller's consummation of the Transaction, including Seller's execution of this Agreement and the Closing Documents required to be delivered by Seller.

(f)  <u>Closing Statement</u>.  A mutually acceptable form of a joint closing statement, setting forth the prorations and adjustments to the Purchase Price respecting the Property to be made pursuant to this Agreement (the "<u>Closing Statement</u>"), executed by Seller.

(g)  <u>Keys and Original Documents</u>.  Keys to all locks on the Real Property in Seller's or Manager's possession and originals or, if originals are not available, copies, of all of the Contracts and other Property documents, to the extent not previously delivered to Buyer.

(h)  <u>Title Documents</u>.  Standard executed title documents as required by the title company.

6.3  <u>Buyer's Closing Deliveries</u>.  At the Closing, Buyer shall deliver the following:

(a)  <u>Purchase Price</u>.  The Purchase Price, as adjusted for apportionments and other adjustments required under this Agreement, plus any other amounts required to be paid by Buyer at Closing.

(b)  <u>Assignment Agreement</u>.  The Assignment Agreement, executed by Buyer.

(c)  <u>Evidence of Authority</u>.  Documentation to establish to Seller's reasonable satisfaction the due authorization of Buyer's consummation of the Transaction, including Buyer's execution of this Agreement and the Closing Documents required to be delivered by Buyer.

(d)  <u>Other Documents</u>.  Applicable transfer or sales tax filings and such other documents as may be reasonably required by the Plan or applicable Sale Order (as defined in the Plan) or as may be agreed upon by Seller and Buyer to consummate the Transaction.

(e)  <u>Closing Statement</u>.  The Closing Statement, executed by Buyer.

(f)  Executed copies or counterparts, as applicable, of each of the documents set forth on Schedule 1 attached hereto (the "<u>Assumption Documents</u>") shall be delivered to Escrow Agent or Seller, at Seller's discretion.

6.4  <u>Conditions to Buyer's Obligations</u>.  Buyer's obligation to close the Transaction is conditioned on all of the following:

(a)  <u>Representations True</u>.  All Seller's Warranties in this Agreement, as the same may be deemed modified as provided in <u>Section 7.3</u>, shall be true and correct in all material respects on and as of the Scheduled Closing Date, as if

made on and as of such date except to the extent that they expressly relate to an earlier date.

(b)     <u>Seller's Deliveries Complete</u>.  Seller shall have delivered all of the documents and other items required pursuant to <u>Section 6.2</u> and shall have performed all other material obligations to be performed by Seller at or prior to the Closing.

(c)     <u>Sale Free and Clear or All Liens, Claims and Encumbrances</u>.  The Sale Order shall state that the sale of the Property to the Buyer is free and clear of all liens, claims and encumbrances, with any such liens, claims and encumbrances to attach to the sale proceeds.

(d)     <u>Good Faith Purchaser</u>.  Pursuant to the Confirmation Order, the Buyer is deemed a good faith purchaser within the meaning of Bankruptcy Code Section 363(m).

6.5     <u>Conditions to Seller's Obligations</u>.  Seller's obligation to close the Transaction is conditioned on all of the following:

(a)     <u>Representations True</u>.  All representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects on and as of the Scheduled Closing Date, as if made on and as of such date except to the extent they expressly relate to an earlier date.

(b)     <u>Buyer's Deliveries Complete</u>.  Buyer shall have delivered the funds required hereunder and all of the documents to be executed by Buyer set forth in <u>Section 6.3</u> and shall have performed all other material obligations to be performed by Buyer at or prior to the Closing.

(c)     <u>Confirmation Order</u>.  A Bankruptcy Court Order confirming the Plan shall have been issued by a court of competent jurisdiction, which order shall not be stayed as of the date of the Closing ("<u>Confirmation Order</u>").

(d)     <u>Good Faith Purchaser</u>.  Pursuant to the Confirmation Order, the Buyer is deemed a good faith purchaser within the meaning of Bankruptcy Code Section 363(m).

(e)     <u>Sale Order</u>.  The Sale Ordershall be entered, final, and non-appealable.  If the Sale Order is stayed, reversed, or vacated as of the Closing, this condition shall not have been satisfied.

6.6     <u>Waiver of Failure of Conditions Precedent</u>.  At any time on or before the date specified for the satisfaction of any condition, Seller or Buyer may elect in writing to waive the benefit of any such condition to its obligations hereunder.  By closing the Transaction, Seller and Buyer shall be conclusively deemed to have waived the benefit of any remaining unfulfilled conditions set forth in this <u>Article 6</u>, except to the extent that the same expressly survive Closing. In the event any of the conditions set forth in this <u>Article 6</u> are neither waived nor fulfilled, Seller or Buyer (as appropriate) may terminate this Agreement (subject to the notice and cure rights set

forth in <u>Article 9</u> and elsewhere in this Agreement) and exercise such rights and remedies, if any, that such party may have pursuant to the terms of <u>Article 9</u>. If this Agreement is terminated as a result of the failure of any condition set forth in this <u>Article 6</u> that is not also a default hereunder, then the Deposit shall be returned to Buyer and, thereafter, neither party shall have any further rights or obligations hereunder except for obligations which expressly survive termination of this Agreement.

6.7   <u>Loan Assumption</u>.

(a)   Buyer acknowledges and agrees that the Property is subject to the Loan (as hereinafter defined) currently held by Secured Noteholder. The transactions contemplated by this Section 6.7 are specifically conditioned upon the approval of Secured Noteholder, Secured Noteholder's approval of Buyer assuming the Loan and a mutually agreeable Loan Assumption agreement.

(b)   Secured Noteholdershall have until 5:00 p.m. Eastern time on the date thirty (30) Business Days after the Effective Date (the "<u>Secured Noteholder Approval Date</u>") to (a) accept, in Secured Noteholder's sole and absolute discretion, the Loan Assumption (hereinafter defined), and (b) obtain any required senior management approval and/or third party consents, waivers or approvals with respect to the Loan Assumption (the "<u>Loan Assumption Approval</u>").

(c)   Buyer shall have the option (simultaneously with the submission hereof) to elect to take an assumption of that certain loan in the original principal amount of $14,200,000.00 made by Ladder Capital Finance LLC ("<u>Original Lender</u>") to36th Street Property Inc., and HR 442 Corp. (as amended, modified, extended and/or assigned), encumbering the Property and evidenced by the Note (as defined in the Loan Agreement dated as of September 3, 2019 between Original Lender and 36th Street Property Inc, and HR 442 Corp.) (the "<u>Loan</u>") upon terms and conditions reasonably acceptable to Seller (the "<u>Loan Assumption</u>") by making such elections in the annexed Loan Assumption Addendum. If Buyer elects to take such Loan Assumption, Buyer will be liable for any fees or deposits that are required in connection with the Loan Assumption, provided, however, that Buyer shall not be liable for fees and costs incurred by Seller prior to the Closing Date (including, for example, liquidation fees, special servicing fees and payoff fees). Buyer shall use commercially reasonable efforts, at its sole cost and expense, to satisfy Secured Noteholder's requirements in order to obtain Secured Noteholder's approval of the Loan Assumption. Without limiting the generality of the foregoing, Buyer shall promptly upon request: (i) submit all information (including financial statements) with respect to Buyer, its principals and affiliates and any obligor with respect to any "carve-out guarantees", environmental indemnities or other indemnification or recourse obligations under the Loan Documents (as such term is defined in the Loan Agreement), as Secured Noteholder may request; (ii) provide such legal opinions as Secured Noteholder may require; (iii) provide information requested by Secured Noteholder concerning the individuals or entities that will be direct or indirect owners of Buyer and/or the Property; (iv) comply with any other conditions to the transfer which may be imposed by the Secured Noteholder in accordance with the Loan

Documents; (v) provide one or more credit worthy individuals or entities that will assume recourse liability under all existing environmental indemnifies or so-called nonrecourse carve-out guarantees; and (vi) not request any changes to the terms of the Loan or the Loan Documents other than those changes needed to reflect the existence of the new borrower and guarantor(s).  Buyer shall execute, acknowledge and deliver to Secured Noteholder at Closing such documents as Secured Noteholder may require in order to confirm the assumption of the Loan Documents by Buyer and the substitute guarantors and indemnitors under all existing environmental indemnities or so-called nonrecourse carve-out guarantees. Buyer shall pay all costs in connection with the loan assumption and loan assumption application, regardless of whether or not the loan assumption and other transactions contemplated hereby close, and such obligations shall survive the termination of this Agreement.

(d) Buyer acknowledges and agrees that, should Buyer exercise the Loan Assumption option set forth in Section 6.7(c) above, Buyer'sFF&E & CapEx Deposit deposited on or before the Closing Datewith Escrow Agent, shall be released to Secured Noteholder and deposited into a restricted account controlled by Secured Noteholder, which may be released by Secured Noteholder to Buyer in accordance with the Loan Documents.

(e) In the event Secured Noteholder does not approve Buyer for the Loan Assumption, Buyer may either (i) cancel this Agreement and receive a return of the Deposit and the FF&E & CapEx Deposit and the parties shall have no further rights or obligations under this Agreement, except to the extent any rights or obligations survive termination of this Agreement, or (ii) proceed to Closing and Seller will return the FF&E & CapEx Deposit to Buyer at Closing.

### ARTICLE 7 - REPRESENTATIONS AND WARRANTIES

7.1    <u>Buyer's Representations</u>.  Buyer represents and warrants to Seller as follows:

7.1.1    <u>Buyer's Authorization</u>.  Buyer (a) is duly organized (or formed), validly existing and in good standing under the Laws of its State of organization and, to the extent required by applicable Laws, the State in which the Real Property is located and (b) is authorized to execute this Agreement and consummate the Transaction and fulfill all of its obligations hereunder and under all Closing Documents to be executed by Buyer, and such instruments, obligations and actions are valid and legally binding upon Buyer, enforceable in accordance with their respective terms.  The execution and delivery of this Agreement and all Closing Documents to be executed by Buyer and the performance of the obligations of Buyer hereunder or thereunder will not (x) result in the violation of any Law or any provision of Buyer's organizational documents, (y) conflict with any order of any court or governmental instrumentality binding upon Buyer, or (z) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment to which Buyer is bound.

7.1.2    <u>Buyer's Financial Condition</u>.  No petition has been filed by or against Buyer under the Federal Bankruptcy Code or any similar Laws.

7.1.3    <u>Patriot Act Compliance</u>.  Neither Buyer nor any person, group, entity or nation that Buyer is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any Law that is enforced or administered by the Office of Foreign Assets Control, and Buyer is not engaging in this Transaction, directly or indirectly, on behalf of, or instigating or facilitating this Transaction, directly or indirectly, on behalf of, any such person, group, entity or nation.  Buyer is not engaging in this Transaction, directly or indirectly, in violation of any Laws relating to drug trafficking, money laundering or predicate crimes to money laundering.  None of the funds of Buyer have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Buyer is prohibited by Law or that the Transaction or this Agreement is or will be in violation of Law.  Buyer has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.

7.1.4    <u>ERISA</u>.  Buyer is not an employee pension benefit plan subject to the provisions of Title IV of ERISA or subject to the minimum funding standards under Part 3, Subtitle B, Title I of ERISA or Section 412 of the Internal Revenue Code or Section 302 of ERISA, and none of its assets constitutes or will constitute assets of any such employee benefit plan subject to Part 4, Subtitle B, Title I of ERISA.  Buyer is not a "governmental plan" within the meaning of Section 3(32) of ERISA and the funds used by Buyer to acquire the Property are not subject to State statutes regulating investments of and fiduciary obligations with respect to governmental plans.

Buyer's representations and warranties in this section shall survive the Closing and not be merged therein.

7.2    <u>Seller's Representations</u>.  Seller represents and warrants to Buyer as follows:

7.2.1    <u>Seller's Authorization</u>.  Seller (a) is duly organized (or formed), validly existing and in good standing under the Laws of its State of organization, and (b) except for such authorization as is required by the Bankruptcy Court, is authorized to execute this Agreement and consummate the Transaction and fulfill all of its obligations hereunder and under all Closing Documents to be executed by Seller, and such instruments, obligations and actions are valid and legally binding upon Seller, enforceable in accordance with their respective terms.

7.2.2    <u>Patriot Act Compliance</u>.  Seller is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any Law that is enforced or administered by the Office of Foreign Assets Control and Seller

is not engaging in this Transaction, directly or indirectly, on behalf of, or instigating or facilitating this Transaction, directly or indirectly, on behalf of, any such person, group, entity or nation. Seller is not engaging in this Transaction, directly or indirectly, in violation of any Laws relating to drug trafficking, money laundering or predicate crimes to money laundering. None of the funds of Seller have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Seller is prohibited by Law or that the Transaction or this Agreement is or will be in violation of Law. Seller has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.

7.3     General Provisions.

    7.3.1    Seller's Warranties Deemed Modified. To the extent that Buyer is deemed to know prior to the Closing Date that Seller's Warranties are inaccurate, untrue or incorrect in any way, such Seller's Warranties shall be deemed modified to reflect Buyer's deemed knowledge.

    7.3.2    Survival; Limitation on Seller's Liability. Seller's Warranties shall survive the Closing and not be merged therein for a period of sixty (60) days, and Seller shall only be liable to Buyer hereunder for a breach of a Seller's Warranty with respect to which Seller receives a written notice of a claim from Buyer on or before the sixtieth (60th) day after the Closing Date. Notwithstanding the foregoing, however, if the Closing occurs, Buyer hereby expressly waives, relinquishes and releases any rights or remedies available to it at law, in equity, under this Agreement or otherwise, including any claim against Seller for damages that Buyer may incur, as the result of any of Seller's Warranties being untrue, inaccurate or incorrect if (a) Buyer is deemed to know that any such Seller's Warranty was untrue, inaccurate or incorrect at the time of the Closing, or (b) the untruth, inaccuracy or incorrectness of such Seller's Warranty is not material.

    7.3.3    Survival. The provisions of this Section 7.3 shall survive the Closing (and not be merged therein) or any earlier termination of this Agreement.

## ARTICLE 8 - COVENANTS

8.1     Buyer's Covenants.

    8.1.1    Reservations. Buyer shall honor all reservations for the Property, or for any related conference, banquet, or meeting space or any recreational facilities in connection with the Property, that are made by Seller on or prior to the date hereof which pertain to periods on or after the Closing, provided that the party that made the reservation complies with its obligations with respect to such reservation and provided such bookings and reservations are upon substantially the same terms and rates which Seller would require and charge in the normal and customary operation of the Property. The foregoing obligation shall survive the Closing (and not be merged therein).

8.1.2    <u>Employment Obligations</u>.

(a)    Buyer or its manager shall make an offer to employ and, effective upon the Closing, transfer and employ a sufficient number of the Employees, without interruption in service and on terms and conditions substantially similar to those in effect prior to Closing, so as not to cause Seller or and Seller Party, as applicable, to be subject to the notification requirements of the United States Worker Adjustment and Retraining Notification Act, as amended, and any other similar applicable state or local law (collectively, the "<u>WARN Act</u>").

(b)    In the event Buyer or its manager shall fail to comply with its obligations set forth in <u>subsection (a)</u> above, Buyer shall be responsible for all obligations, damages, fines or penalties arising under the National Labor Relations Act, the WARN Act or other applicable Law and with respect to any employees of Seller or Manager (and Buyer shall indemnify, defend, and hold each of Seller and all Seller Parties free and harmless from and against any and all Liabilities (including reasonable attorneys' fees, expenses and disbursements) arising out of or resulting from the same).

8.1.3    <u>Books and Records</u>.  From and after the Closing Date, Buyer shall maintain, preserve and, upon reasonable notice, provide Seller or its representatives with access during normal business hours to, and the right to make copies (at Seller's expense) of all accounting and other books and records relating to the use, maintenance and operation of the Hotel relating to periods prior to the Closing Date (collectively, the "<u>Books and Records</u>").

8.1.4    <u>Survival</u>.  The foregoing obligations of Buyer under this <u>Section 8.2</u> shall survive the Closing (and not be merged therein).

8.2    <u>Maintenance of Property</u>.  Except to the extent Seller is relieved of such obligations by <u>Article 10</u>, between the Effective Date and the Closing, Seller shall use commercially reasonable efforts to operate and maintain the Property in a reasonably prudent fashion and in accordance with past practices, subject, however, to the Plan, the Sale Order and limitations otherwise imposed by such bankruptcy proceeding; and further<u>provided,</u> <u>however,</u> Seller shall not be obligated to perform any capital improvements or any deferred maintenance repairs.  Buyer hereby agrees that, except for breaches of this <u>Section 8.2</u>, Buyer, shall accept the Property subject to, and Seller shall have no obligation to cure, (a) any violations of Laws, or (b) any physical conditions which would give rise to violations of Laws, whether the same now exist or arise prior to Closing.  Between the Effective Date and the Closing, Seller will advise Buyer of any written notice Seller receives after the Effective Date from any governmental authority of the violation of any Laws regulating the condition or use of the Property.

8.3    <u>Guest Baggage</u>.  Any baggage or other property of departed guests held by Seller at the Property shall be inventoried, sealed and tagged jointly by Seller and Buyer as of the Closing and may be left at the Property for a period not to exceed ninety (90) days following the Closing Date.  After such period, all such baggage or property will be deemed abandoned by Seller, and Buyer shall dispose of such baggage in any manner deemed appropriate by Buyer. Buyer hereby indemnifies Seller against all Liabilities in connection with the holding such baggage or other property for such period and Buyer's disposal of baggage abandoned by Seller.

All baggage of guests who are still guests of the Property on the Closing Date which has been checked with or left in the care of Seller shall be inventoried, sealed and tagged jointly by Seller and Buyer as of the Closing.  Buyer hereby agrees to indemnify Seller against all Liabilities with respect to such baggage arising out of the acts or omissions of Buyer after the Closing.  The provisions of this section shall survive the Closing (and not be merged therein).

8.4    <u>Liquor License</u>.  Buyer understands and acknowledges that there is not any liquor license being transferred pursuant to the Transaction.

8.5    <u>Brokers</u>.  Buyer expressly acknowledge that Broker has acted as the exclusive broker with respect to the Transaction and with respect to this Agreement.  Seller shall pay any brokerage commission due to Broker in accordance with the separate agreement with Broker.  Seller agrees to hold Buyer harmless and indemnify Buyer from and against any and all Liabilities (including reasonable attorneys' fees, expenses and disbursements) suffered or incurred by Buyer as a result of any claims by Broker or any other party claiming to have represented Seller as broker in connection with the Transaction.  Buyer agrees to hold Seller harmless and indemnify Seller from and against any and all Liabilities (including reasonable attorneys' fees, expenses and disbursements) suffered or incurred by Seller as a result of any claims by any party claiming to have represented Buyer as broker in connection with the Transaction.  The provisions of this section shall survive the Closing (and not be merged therein) or the earlier termination of this Agreement.

8.6    <u>Confidentiality</u>.    Buyer shall hold, and shall cause the other Buyer's Representatives and any prospective investors in Buyer to hold in strict confidence and not disclose to any other person without the prior written consent of Seller:  (i) the terms of the Agreement, (ii) unless and until the Closing occurs, any of the information in respect of the Property delivered or made available to any Buyer's Representatives, and (iii) the identity of any direct or indirect owner of any beneficial interest in Seller.  In the event the Closing does not occur or this Agreement is terminated, Buyer shall promptly return to Seller all copies of documents containing any of such information without retaining any copy thereof or extract therefrom.  Notwithstanding the foregoing, each of Buyer may disclose such information (A) on a need-to-know basis to its employees, agents, consultants, and members of professional firms serving it or potential lenders or investors, or (B) as any governmental agency or regulators may require in order to comply with applicable Laws, a court order or a regulatory examination, or (C) to the extent that such information is a matter of public record.  Buyer hereby agrees to indemnify, defend, and hold each of the Seller Parties free and harmless from and against any and all Liabilities (including reasonable attorneys' fees, expenses and disbursements) arising out of or resulting from the breach of the terms of this section by Buyer.  The provisions of this section shall survive the Closing (and not be merged therein) or earlier termination of this Agreement.

8.7    <u>Delivery of Information Regarding Compliance</u>.  Upon request by Seller, Buyer agrees to provide documentation reasonably necessary or desirable for Seller to verify that the representations and warranties made in <u>Section 7.1.3</u> are true, accurate and complete, which documentation shall include, without limitation, information regarding the ownership of Buyer and a list of any person or entity that directly or indirectly owns more than a 25% interest in Buyer.  In addition, if after review of such information Seller determines that it needs additional information regarding the owners of Buyer, Buyer agrees to provide Seller with the Social

Security number, FEIN number, or a copy of the passport, as applicable, for each such person or entity or such other information that Seller requires in lieu thereof. Notwithstanding any provision in this Agreement to the contrary, Seller may disclose such information, without notice to Buyer, to any government agency or regulators in connection with any regulatory examination or if Seller reasonably believes that such disclosure is required by Law or its regulatory compliance policies.

## ARTICLE 9 - DEFAULTS

9.1    <u>Seller's Remedies for Buyer Defaults</u>. If, (i) on the Scheduled Closing Date, Buyer fails to deliver the balance of the Purchase Price in accordance with <u>Sections 2.3</u> and <u>6.1</u>, or (ii) on or before the Scheduled Closing Date Buyer is in default of any of its other material obligations hereunder or any of Buyer's representations or warranties are, in the aggregate, untrue, inaccurate or incorrect in any material respect, then Seller shall have the right to elect as its sole and exclusive remedy, to (a) terminate this Agreement by written notice to Buyer, promptly after which the Deposit shall be paid to Seller as liquidated damages and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Agreement, or (b) waive the default or breach and proceed to close the Transaction. Seller and Buyer have discussed the possible consequences to Seller in the event that the Closing does not occur by reason of any of the events described in this section. The parties agree that it would be impractical or extremely difficult to determine the actual damages to Seller in such event and that a reasonable estimate of such damages is an amount equal to the Deposit.

9.2    <u>Buyer's Remedies for Seller Defaults</u>. If, on or before the Scheduled Closing Date, Seller is in default of any of its material obligations hereunder, or any of Seller's Warranties are, in the aggregate, untrue, inaccurate or incorrect in any material respect, and any such circumstance described in this sentence continues for five (5) Business Days after written notice (which written notice shall detail such default or breach), then Buyer shall have the right to elect, as its sole and exclusive remedy, to (a) terminate this Agreement by written notice to Seller, promptly after which the Deposit shall be returned to Buyer and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Agreement, (b) waive the default or breach and proceed to close the Transaction,or (c) bring an action for specific performance.

9.3    <u>Indemnity Obligations</u>. Notwithstanding any provision in this Agreement to the contrary, in no event shall the provisions of this <u>Article 9</u> limit the rights of either party against the other party due to the other party's obligation to indemnify such party in accordance with this Agreement or the damages recoverable pursuant to such indemnification obligations. This section shall survive the Closing (and not be merged therein) or the earlier termination of this Agreement.

## ARTICLE 10 - CASUALTY/CONDEMNATION

10.1    <u>Right to Terminate</u>. If, after the Effective Date, (a) any portion of the Property is taken by condemnation or eminent domain (or is the subject of a pending taking), or (b) any portion of the Property is damaged or destroyed (excluding routine wear and tear and damage caused by any Buyer's Representative), Seller shall notify Buyer in writing of such fact promptly

after obtaining knowledge thereof.   If the Property is the subject of a Major Casualty/Condemnation (as hereinafter defined) that occurs after the Effective Date, Buyer shall have the right to terminate this Agreement by giving written notice to Seller no later than ten (10) Business Days after the giving of Seller's notice, and the Scheduled Closing Date shall be extended, if necessary, to provide sufficient time for Buyer to make such election.  The failure by Buyer to terminate this Agreement within such ten (10) Business Day period shall be deemed an election not to terminate this Agreement.   If this Agreement is terminated pursuant to this section, the Deposit shall be returned to Buyer and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Agreement.  For the purposes of this Agreement, "Major Casualty/Condemnation" shall mean any casualty, condemnation proceedings, or eminent domain proceedings if (i) the portion of the Property that is the subject of such casualty or such condemnation or eminent domain proceedings has a value in excess of Two Hundred Fifty Thousand Dollars ($250,000), as reasonably determined by Seller, or (ii) any casualty is an uninsured casualty and Seller, in its sole and absolute discretion, does not elect to cause the damage to be repaired or restored or give Buyer a credit at Closing for such repair or restoration.

10.2    Allocation of Proceeds and Awards.  If a condemnation or casualty occurs after the Effective Date and this Agreement is not terminated as permitted pursuant to the terms of Section 10.1, then this Agreement shall remain in full force and effect, Buyer shall acquire the remainder of the Property upon the terms set forth herein.  Any awards or proceeds from the condemning authority or Seller's insurance company, as the case may be (the "Casualty/Condemnation Proceeds") shall be allocated between Buyer and Seller as follows: (a) Seller shall be entitled to be reimbursed from the Casualty/Condemnation Proceeds for (i) all costs, expenses and fees, including reasonable attorneys' fees, expenses and disbursements, incurred by Seller in connection with negotiating the settlement of such award or proceeds, (ii) proceeds of any rental loss, business interruption or similar insurance, or other compensation for loss of use or income, that are allocable to the period prior to the Closing Date, and (iii) the reasonable and actual costs incurred by Seller in physically stabilizing the Property following a casualty; and (b) Buyer shall be entitled to (i) the balance of the Casualty/Condemnation Proceeds, and (ii) a credit from Seller equal to Seller's deductible with respect to a casualty, if the same is an insured casualty.

10.3    Insurance.  Seller shall maintain the property and liability insurance coverage currently in effect for the Property, or comparable coverage, through the Closing Date.

10.4    Waiver.   The provisions of this Article 10 supersede the provisions of any applicable Laws with respect to the subject matter of this Article 10.

## ARTICLE 11 - MISCELLANEOUS

11.1    Assignment.  Except as provided in Section 11.4, this Agreement may not be assigned by either party.

11.2    Survival/Merger.   Except for the provisions of this Agreement which are explicitly stated to survive the Closing, (a) none of the terms of this Agreement shall survive the Closing, and (b) the delivery of the Purchase Price, the Deed and the other Closing Documents

and the acceptance thereof shall effect a merger, and be deemed the full performance and discharge of every obligation on the part of Buyer and Seller to be performed hereunder.

11.3    Integration; Waiver.    This Agreement embodies and constitutes the entire understanding between the parties with respect to the Transaction, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement. Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signedby theparty against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.    No waiver by either party hereto of any failure or refusal by the other party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

11.4    Governing Law.    This Agreement shall be governed by, and construed in accordance with, Title 11 of the United States Code, and to the extent applicable to contract matters, the laws of the State of New York.    Any action or proceeding involving this Agreement shall only be commended in the Bankruptcy Court for the Eastern District of New York.    Service of any summons and or complaint or other process in any such action or proceeding may be made by certified mail directed to Seller or Purchaser, as applicable, at the addresses set forth in Section 11.8, personal service being waived.    Notwithstanding any provisions of this Agreement to the contrary, in the event Buyer is the Secured Noteholder (as defined in the Plan) (or its nominee or designee or assignee), all obligations of Buyer under this Agreement shall be governed and subject to the terms and conditions applicable to such Secured Noteholder of the Plan and Sale Order, including, without limitation, not being required to post the Deposit or paying all or a portion of the Purchase Price by discharging all or a portion of its secured claim against Seller.

11.5    Captions Not Binding; Exhibits.    The captions in this Agreement are inserted for reference only and in no way limit the scope or intent of this Agreement or of any of the provisions hereof.    All Exhibits attached hereto shall be incorporated by reference as if set out herein in full.

11.6    Binding Effect.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11.7    Severability.    If any term or provision of this Agreement or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

11.8    Notices.    Any notices or other communications under this Agreement must be in writing, and shall be deemed duly given or made at the time and on the date when received by e-mail transmittal of pdf files or similar electronic means or when personally delivered as shown on a receipt therefor (which shall include delivery by a nationally recognized overnight delivery service) to the address for each party set forth below.    Any party, by written notice to the other in the manner herein provided, may designate an address different from that set forth below.

<u>IF TO BUYER</u>:

Hudson West Hospitality LLC
c/o Neil H. Kupferman, Esq., P.C.
459 6th Avenue
Brooklyn, New York 11215

<u>COPY TO</u>:

Neil H. Kupferman, Esq., P.C.
459 6th Avenue
Brooklyn, New York 11215
Attention:  Oren Goldhaber, Esq.
Telephone #:  718-768-3046
E-Mail Address:  og@nhklaw.com


<u>IF TO SELLER</u>:

36th Street Property Inc& HR 442 Corp.
c/o Janus Hotel Management Services, LLC
_____
_____
Attention:
Telephone:
E-Mail Address:

COPY TO:

Morrison Tenenbaum
87 Walker Street, Floor 2
New York, New York 10013
Attention: Robert Dakis, Esq.
Telephone: 212-620-0938
E-Mail Address: rd@morr-law.com

Rialto Capital Advisors LLC
200 S Biscayne Boulevard
Miami, Florida 33131
Attention: Javier Callejas
Telephone: 305-409-2485
E-Mail Address: javier.callejas@rialtocapital.com

Holland & Knight LLP
31 West 52nd Street
New York, New York 10019
Attention:  Keith M. Brandofino, Esq.
            Bruce J. Zabarauskas, Esq.
Telephone #:  212-751-3166
              214-969-2511
E-Mail Address: keith.brandofino@hklaw.com
bruce.zabarauskas@hklaw.com

11.9   Counterparts; Electronic Signatures.   This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.  Signatures to this Agreement transmitted by electronic means shall be valid and effective to bind the party so signing.  Each party agrees to promptly deliver an execution original to this Agreement with its actual signature to the other party, but a failure to do so shall not affect the enforceability of this Agreement.

11.10   No Recordation.   Seller and Buyer each agrees that neither this Agreement nor any memorandum or notice hereof shall be recorded and Buyer agrees (a) not to file any notice of pendency or other instrument against the Property or any portion thereof in connection herewith, and (b) to indemnify Seller against all Liabilities (including reasonable attorneys' fees, expenses and disbursements) incurred by Seller by reason of the filing by Buyer of such notice of pendency or other instrument.

11.11   Additional Agreements; Further Assurances.   Each of the parties hereto shall execute and deliver such documents as the other party shall reasonably request in order to consummate and make effective the Transaction; provided, however, the execution and delivery of such documents shall not result in any additional liability or cost to the executing party.

11.12   <u>Construction</u>.   The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, any modification hereof or any of the Closing Documents.

11.13   <u>Time of Essence</u>.  Time is of the essence with respect to the Closing and all of the provisions of this Agreement.

11.14   <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY PROCEEDINGS BROUGHT BY THE OTHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE TRANSACTION, THIS AGREEMENT, THE PROPERTY OR THE RELATIONSHIP OF BUYER AND SELLER HEREUNDER.  THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING (AND NOT BE MERGED THEREIN) OR ANY EARLIER TERMINATION OF THIS AGREEMENT.

11.15   <u>RELEASES</u>.  WITH RESPECT TO ANY RELEASE SET FORTH IN THIS AGREEMENT RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, THE PARTIES HERETO HEREBY ACKNOWLEDGE THAT SUCH WAIVER AND RELEASE IS MADE WITH THE ADVICE OF COUNSEL AND WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE CONSEQUENCES AND EFFECTS OF SUCH RELEASE.

11.16   <u>Buyer Access</u>.   Buyer and its affiliates shall have access to the Property for purposes of inspection upon reasonable notice and during normal business hours from and after the Sale Order has been entered.

11.17   <u>Collective Bargaining Agreements</u>.  To the best of Seller's knowledge, Seller is not subject to any collective bargaining agreements.

11.18   <u>Right to Terminate</u>.  In the event the Sale Order has not been granted by the Court on or before six (6) months from the Effective Date of this Agreement (the "<u>Court Approval Deadline</u>"), Buyer shall have the option to terminate this Agreement by written notice to Seller on or before five (5) days prior to Court Approval Deadline.  Seller shall thereafter return the Deposit and FF&E & CapEx Deposit.  Following the termination of this Agreement in accordance with this Section 11.18, neither party shall have any rights or obligations under this Agreement, except with respect to those rights and obligations that survive the termination of this Agreement.

***[Remainder of page intentionally blank]***

    ***IN WITNESS WHEREOF***, each party hereto has caused this Agreement to be duly executed to be effective as of the day and year first above written.

**SELLER:**

**36th Street Property Inc**, a New York corporation

By:  Janus Hotel Management Services, LLC, its manager

    By: _____
Name: Michael Nanosky
Title:  President

**HR 442 Corp.**, a New York Corporation

By:  Janus Hotel Management Services, LLC, its manager

    By: _____
Name: Michael Nanosky
Title:  President

[*Signatures continue on next page*]

**BUYER:**

**Hudson West Hospitality, LLC**, a New York limited liability company

By: _____

Name: _____SHASHIN GANDHI_____

Title: _____MANAGING MEMBER_____

# EXHIBIT A

## LEGAL DESCRIPTION

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, known and distinguished on a map entitled "Map showing the situation of 144 lots of land being a part of Glass House Farm, the property of George Rapelle Esq., drawn by Adolphus Loss, C.S." by the No.138, bounded and described as follows:

BEGINNING at a point on the Southerly side of 36th Street distant 250 feet Easterly from the Southeasterly corner of 36th Street and 10th Avenue;

RUNNING THENCE Southerly parallel with 10th Avenue, 98 feet 9 inches;

THENCE Easterly parallel with 36th Street, 25 feet;

THENCE Northerly parallel with 10th Avenue, 98 feet 9 inches to the Southerly side of 36th Street;

THENCE Westerly along the Southerly side of 36th Street, 25 feet to the point or place of BEGINNING.

FOR INFORMATION ONLY: Premises also known as 442 West 36th Street, New York, NY
Block 733 Lot 60

# EXHIBIT B

## ESCROW PROVISIONS

The Deposit and any other sums (including, without limitation, any interest earned thereon) which the parties agree shall be held in escrow (herein collectively called the "Escrow Deposits"), shall be held by the Escrow Agent, in trust, and disposed of only in accordance with the Plan and Sale Order and the following provisions:

1.      The Escrow Deposit shall be held in a non-interest bearing account.

2.      Except as expressly otherwise set forth in this **Exhibit B**, if for any reason the Closing does not occur and either party makes a written demand upon the Escrow Agent for payment of the Escrow Deposits, the Escrow Agent shall give written notice to the other party of such demand.  If the Escrow Agent either (i) receives written assent from the other party to the proposed payment or (ii) does not receive a written objection from the other party to the proposed payment within ten (10) days after the giving of such notice, the Escrow Agent is hereby authorized to make such payment.  If the Escrow Agent receives such written objection within such period, the Escrow Agent shall continue to hold such amount until otherwise directed by written instructions signed by Seller and Buyer or a final judgment of a court.

3.      If the Closing occurs, the Escrow Agent shall deliver the Escrow Deposits in accordance with the terms of the Plan on the Closing Date.

4.      The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for any Liabilities (including reasonable attorneys' fees, expenses and disbursements) incurred by Seller or Buyer resulting from actions or omissions taken or made by the Escrow Agent involving gross negligence or willful misconduct on the part of the Escrow Agent.

5.      Intentionally omitted.

6.      The provisions of this **Exhibit B** shall survive the Closing (and not be merged therein) or earlier termination of this Agreement.

## EXHIBIT C

## FORM OF BILL OF SALE

**THIS BILL OF SALE** (this "Bill of Sale"), is executed as of _____, 202__ by _____, a _____ ("Seller") for the benefit of _____, a _____ ("Buyer").

*W I T N E S S E T H:*

WHEREAS, pursuant to the terms of that certain Purchase and Sale Agreement, dated as of _____, 20__, by and between Buyer and Seller (as the same may have been amended, modified or assigned, the "Sale Agreement"), Seller agreed to sell to Buyer, *inter alia*, certain real property, the improvements located thereon and certain rights appurtenant thereto, all as more particularly described in the Sale Agreement (collectively, the "Real Property"). Initially capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in the Sale Agreement; and

WHEREAS, by deed of even date herewith, Seller conveyed the Real Property to Buyer; and

WHEREAS, in connection with the above described conveyance Seller desires to sell, transfer and convey to Buyer certain items of tangible personal property as hereinafter described.

NOW, THEREFORE, in consideration of the receipt of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand by Buyer to Seller, the receipt and sufficiency of which are hereby acknowledged, Seller has SOLD, TRANSFERRED, and CONVEYED and by these presents does hereby SELL, TRANSFER, and CONVEY to Buyer and Buyer hereby accepts all right, title and interest in and to all furniture, fixtures, artwork, and equipment, all supply inventory of Seller (including without limitation, china, glass and silver, linen, consumables, food and beverage inventory (whether in open or unopened containers, to the extent permitted by applicable Law), repair parts, keys and supplies) as of the date hereof and other items of tangible personal property owned by Seller located on the Real Property and used in the ownership, operation and maintenance of any portion of the Real Property and the Hotel, and all books, records and files of Seller relating to the Real Property, but specifically excluding any Protected Information (herein collectively called the "Personal Property").

This Bill of Sale is made without any warranty or representation by Seller other than Seller's Warranties (as defined in the Sale Agreement) or any covenant or recourse against Seller other than as provided in the Sale Agreement.

Seller's liability under this Bill of Sale shall be limited as set forth in Section 4.3 of the Sale Agreement.

***[Remainder of page intentionally blank]***

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale to be effective as of the date first set forth hereinabove.

**SELLER:**

_____, a
_____

By: _____
Name: _____
Title: _____

**EXHIBIT D**

**FORM OF ASSIGNMENT OF INTANGIBLE PROPERTY**

      **THIS ASSIGNMENT OF INTANGIBLE PROPERTY** (this "<u>Assignment</u>"), is made as of _____, 202__ by and between _____, a _____ ("<u>Assignor</u>") and _____, a _____ ("<u>Assignee</u>").

<i>W I T N E S S E T H:</i>

      WHEREAS, pursuant to the terms of that certain Purchase and Sale Agreement, dated as of _____, 2023, by and between Assignee and Assignor (as the same may have been amended, modified or assigned, the "<u>Sale Agreement</u>"), Assignor agreed to sell to Assignee, *inter alia*, certain real property, the improvements located thereon and certain rights appurtenant thereto, all as more particularly described in the Sale Agreement (collectively, the "<u>Real Property</u>").  Initially capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in the Sale Agreement; and

      WHEREAS, the Sale Agreement provides, *inter alia*, that Assignor shall assign to Assignee certain rights to certain intangible property and that Assignor and Assignee shall enter into this Assignment.

      NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

      1.    <u>Assignment of Intangible Property</u>.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the following, if and only to the extent the same may be assigned or quitclaimed by Assignor without expense to Assignor in excess of a nominal transfer fee:

      (a)    all reservation commitments for use of rooms, banquets, or other facilities at the Hotel; all guest lists, reservations, catering and banquet records and other records relating to the operation of the Hotel (current and historical), including all repair and improvement, and supply and inventory records, to the extent that the same are owned by Assignor (but specifically excluding payroll and employment records to the extent prohibited by applicable law); all petty cash funds in the hands of Seller in connection with the guest operations at the Hotel, to the extent that Assignor receives a credit for the same as of the date hereof; the guest accounts receivable for the Hotel, to the extent that Assignor receives a credit for the same as of the date hereof; to the extent that the same are in effect as of the date hereof, any licenses, permits and other written authorizations necessary for the use, operation or ownership of the Real Property; and

      (b)    any guaranties and warranties in effect as of the date hereof with respect to any portion of the Real Property or the personal property conveyed to Assignee by Assignor concurrently herewith.

Assignee hereby accepts the foregoing assignment of the interests described in this <u>Section 1</u> (collectively, the "<u>Intangible Property</u>") and assumes the obligations with respect thereto as and to the extent provided in the Sale Agreement.

Exhibit D, Page 1

2.      <u>Reservation of Benefits</u>.    Notwithstanding anything to the contrary in this Assignment, to the extent that Assignor continues to have liability after the date hereof with respect to the Property, Assignor reserves and retains such benefits under the Intangible Property as are necessary or desirable for Assignor to defend or protect itself with respect to or to assert any rights relating to any matter for which Assignor may continue to have liability from and after the date hereof; <u>provided</u>, <u>however</u>, said benefits reserved and retained by Assignor pursuant to this Section shall exist jointly with Assignee's benefits under the Intangible Property, and such benefits may be enforceable by each of Assignor and Assignee.  Assignee and Assignor agree to cooperate with the reasonable requests of the other party in enforcing their respective benefits under the Intangible Property to the extent such benefits are reserved by Assignor pursuant to the terms of this Section.

3.      <u>Limitation on Liability</u>.    Assignor's liability under this Assignment shall be limited as set forth in <u>Section 4.3</u> of the Sale Agreement.

4.      <u>Miscellaneous</u>.    This Assignment and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns, shall be governed by and construed in accordance with the laws of the State in which the Real Property is located applicable to agreements made and to be wholly performed within said State and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.

5.      <u>Severability</u>.  If any term or provision of this Assignment or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforced to the fullest extent permitted by law.

6.      <u>Counterparts</u>.  This Assignment may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

*[Remainder of page intentionally blank]*

IN WITNESS WHEREOF, the undersigned have executed this Assignment to be effective as of the date first set forth hereinabove.

**ASSIGNOR:**

_____, a
_____

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

_____, a
_____

By: _____
Name: _____
Title: _____

## EXHIBIT E

## <u>FORM OF FIRPTA AFFIDAVIT</u>

Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a United States real property interest by _____, a _____ ("<u>Seller</u>"), Seller hereby certifies the following:

1.      Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations); and

2.      Seller is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Internal Revenue Code; and

3.      Seller's U.S. employer taxpayer identification number is 27-0070317; and

4.      Seller's office address is _____.

*[signature appears on following page]*

Seller understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Dated: _____, 202.

_____,                    a

_____

By: _____

Name: _____

Title: _____

STATE OF _____        §

                                             §

COUNTY OF _____        §

On _____, 202, before me, the undersigned, a notary public in and for said State, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that, by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____, Notary Public

My Commission Expires: _____

**EXHIBIT F**

**Purchase Price Allocation**

To be determined on or before the hearing on the Sale Motion (as such term is defined in the Plan), with not less than 97% of the Purchase Price being allocated to the property of Owner.

**SCHEDULE 1**

**Assumption Documents**

1. [Omnibus Assignment]

2. [Loan Assumption and Modification Agreement]

3. [Memorandum of Loan Assumption and Modification Agreement]

4. [Guaranty of Recourse Obligations]

5. [Environmental Indemnity Agreement]

6. [Assignment of Management Agreement]

7. [Clearing Account Agreement]

8. [Cash Management Agreement]

9. [Conditional Assignment of Asset Management Agreement]

10. [Subordination Agreement]

11. [Post-Closing Agreement]

[Additional Assumption Documents to be added as required by Secured Noteholder.]

# <u>LOAN ASSUMPTION ADDENDUM</u>

**<u>Seller</u>**: 36th STREET PROPERTY INC, andHR 442 CORP., each a New York corporation

**<u>Buyer</u>**: Hudson West Hospitality, LLC, a New York limited liability company

**<u>Property Address</u>**:442 West 36th Street, New York, New York  10018

This Loan Assumption Addendum ("**<u>Addendum</u>**"), dated effective as of _____, amends and supplements that certain purchase and sale agreement ("Agreement") between Buyer and Seller for the purchase and sale of the real property identified above. If there is a conflict between the terms of the Agreement and the terms of this Addendum, the terms of this Addendum shall control. Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

1. **<u>PAYMENT OF PURCHASE PRICE</u>**. Buyer may elect to have a portion of the Purchase Price credited to Buyer's account at Closing if Buyer elects, in Section 2 below, to assume the Loan (including, but not limited to, the Note) evidencing certain obligations of Seller to the Secured Noteholder and accept conveyance of the Property subject to the instrument(s) securing the Note.

2. **<u>BUYER'S ELECTION REGARDING ASSUMPTION OF LOAN (CHECK APPLICABLE BOX)</u>**.

   ☐    Buyer <u>DOES NOT</u> elect to assume the Loan. Despite anything to the contrary in the Agreement, Buyer shall pay, as additional closing costs and not as a credit to the Purchase Price, a prepayment fee equal to the aggregate prepayment fees payable under the Note (as defined in the Loan Agreement) and the other Loan Documents relating to the Note for the payment in full of the obligations evidenced by the Note (collectively, the "**<u>Prepayment Fee</u>**"). Buyer acknowledges that Buyer has been previously provided with copies of the Note and other Loan Documents setting forth the Prepayment Fee and represents that such documents are sufficient for Buyer to ascertain the method of calculation of the Prepayment Fee as set forth therein; provided, however, that Buyer acknowledges that the final calculation and determination of the Prepayment Fee shall be made by Secured Noteholder (or their servicer(s)) in accordance with the Note and the other Loan Documents. At Closing, Escrow Agent is instructed to pay the obligations evidenced by the Note in full and obtain full releases of the Mortgage(as defined in the Loan Documents) as they relate to the Property. Payment of the Note and any fees or costs incurred in connection with paying such obligations or obtaining releases from the Mortgage shall be paid from the Prepayment Fee deposited by Buyer and the excess shall be paid from proceeds due Seller at Closing. If neither box in this Section 2 is checked or both boxes are checked in this Section 2, Buyer shall be deemed to have elected to not assume the Notes and to have elected to pay the Prepayment Fee.

☐      Buyer <u>DOES</u> elect to assume the Note. Seller and Secured Noteholder hereby instruct Escrow Agent to credit Buyer's account at Closing in the amount of the aggregate unpaid principal balance of the Note as of the Closing from proceeds due Seller. The aggregate unpaid principal balance of the Note as of _____ is $_____. The following subsections (a) through (d) shall apply to the Agreement only if Buyer elects to assume the Notes:

    a.   <u>Additional Closing Deliveries</u>. The term "Buyer's Deliveries" shall also include documentation reasonably acceptable to Seller that Seller (including any guarantors) will be released from the obligations evidenced by the Note upon Closing.

    b.   <u>Necessary Approvals</u>. Buyer acknowledges and agrees that the approval of one or more third parties may be necessary for Buyer to assume the Loan ("**Necessary Approvals**"). Buyer shall use reasonable and good faith efforts to obtain all Necessary Approvals on or before Closing Date, including, without limitation, (i) providing to Secured Noteholder and the Escrow Agent (as appropriate) all documents and information reasonably requested by or on behalf of Secured Noteholder within seven (7) Business Days following such request, (ii) to the extent required by Secured Noteholder, providing one or more replacement guarantors, and (iii) paying any reasonable fees or costs incurred in connection with such assumption. Despite anything to the contrary in the Agreement, any costs or fees payable in connection with obtaining the Necessary Approvals shall be the sole responsibility of Buyer, including but not limited to any deposits required by Secured Noteholder and any attorney fees. Seller makes no representations or warranties regarding Buyer's ability to obtain the Necessary Approvals, and shall have no liability with respect thereto. This Section shall survive the termination of the Agreement.

    c.   <u>Closing Date</u>. If Buyer or Seller is unable to close the transaction on or before the original Closing Date because the Necessary Approvals have not yet been obtained, then the Closing Date shall be automatically extended for another thirty (30) days (provided that Seller and Buyer may mutually agree to accelerate the Closing Date once the Necessary Approvals have been obtained).

    d.   <u>Additional Title Policy Exceptions</u>. Despite anything to the contrary in the Agreement, the owner's policy of title insurance covering the Property described in the Agreement shall also be subject to the Mortgage.

**SELLER:**


36th STREET PROPERTY INC, a New York corporation

By: _____
Name:
Title:


HR 442 CORP.,a New York corporation


By: _____
Name:
Title:


**BUYER**:

HUDSON WEST HOSPITALITY, LLC,
a New York limited liability company


By: _____
Name: _____
Title: _____

# Exhibit 2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x
:
In re                                               :        Case Nos. 22-bk-40563 (JMM)
:                    22-bk-40562 (JMM)
36TH STREET PROPERTY, INC., and         :
HR 442 CORP.,                                  :        Chapter 11
:
Debtors.        :
:
------------------------------------------------------x

### ORDER (A) ESTABLISHING PROCEDURES FOR THE
### SUBMISSION OF HIGHER AND BETTER OFFERS;
### AND (B) SCHEDULING A HEARING TO APPROVE THE SALE

36th Street Property Inc. (the "Owner Debtor") and HR 442 Corp. (the "Operator Debtor")

(collectively, the "Debtors") having filed a *Motion for an Order: (A) Approving Sale of*

*Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances*

*Pursuant to Bankruptcy Code §§ 363(b), (f) and (m) and Federal Bankruptcy Rules 2002, 6004*

*and 6006 to Stalking Horse, Subject to Higher and Better Offers; (B) Establishing Procedures for*

*the Submission of Higher and Better Offers; (C) Scheduling A Hearing to Approve the Sale; and*

*(D) Providing for the  Payment of Secured Noteholder Claim from the Operator Debtor Carve*

*Out, Subject to an Agreed Carve Out, and Incorporated Memorandum of Law* (the "Motion")[1];

and a hearing on the Motion having been held before the Court; and sufficient cause appearing for

granting the Motion; therefore

### THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
### CONCLUSIONS OF LAW:

A.      The Debtors have articulated good and sufficient reasons for this Court to:

(i) approve the Bid Procedures, including the Stalking Horse; (ii) authorize the sale of the Sale

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Motion.

Assets pursuant to the Bid Procedures, free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code § 363(b) and (f) with all existing liens, claims and encumbrances attaching to the proceeds of such sale in the same priority as already exist, subject to a final hearing approving the sale to the Winning Bidder, a determination that the Winning Bidder is a good faith purchaser entitled to the protections of Bankruptcy Code § 363(m), approving carve-outs agreed to by the Secured Noteholder, and providing for the payment of the Secured Noteholder's claim.

B.       The Bidding Procedures, attached as **Exhibit A** to this Order, including the designation of Hudson West Hospitality, LLC as the Stalking Horse, are designed to encourage all entities to put their best bids forward and to maximize the purchase price of the Sale Assets for the Debtors.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing it is therefore,

**ORDERED THAT**:

1.       **Granting of Motion**.  The Motion is granted to the extent provided herein.

2.       **Approval Of Bid Procedures**.  The Bid Procedures for the sale of the Assets, including the designation of the Stalking Horse, annexed hereto as **Exhibit A** are approved.  The following dates and deadlines are established (subject to modification in accordance with the Bid Procedures):

| | |
|---|---|
| **Three business days before the Confirmation hearing at 5:00 p.m. (EST)** | Bid Deadline |
| **Within 24 hours of the Bid Deadline** | Debtors shall file a notice of Auction (or cancellation of Auction, as applicable) |
| **January    , 2024 at 9:00 a.m. (EST)** | Auction (if required) |
| **Within 24 hours of the conclusion of the Auction** | Debtors shall file a notice of the Winning Bid |
| **Within 24 hours of the conclusion of the Auction** | Debtors shall file a proposed Sale Order |
| **No later than 24 hours before the Sale Hearing** | Deadline to object to the Sale |

| **The same time as the Confirmation Hearing** | Sale Hearing |
| **The first business day following the entry of the Sale Order** | Target Consummation Date |

3.      <u>**Authorization And Direction For The Sale Of The Property**</u>.  The Debtors are authorized to sell the Sale Assets free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code §§ 363(b) and (f) pursuant to the terms of this Order, with existing liens, claims and encumbrances attaching to the proceeds of such sale in the same priority as presently exist on such assets, subject to a final hearing to be held before the Court on January __, 2024 for approval of such Sale to the Winning Bidder, a determination that the Winning Bidder is a good faith purchaser entitled to the protections of Bankruptcy Code § 363(m), approving carve-outs agreed to by the Secured Noteholder, and providing for the payment of the Secured Noteholder's claim

4.      <u>**"As Is Where Is"**</u>.  The sale of the Sale Assets is without representation or warranties of any kind, nature or description.  The Sale Assets shall be transferred "as is," "where is" and "with all faults."  **ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IS EXPRESSLY DISCLAIMED AND THERE SHALL BE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF THE ASSETS OR ANY POTION THEREOF.**  Any purchaser of the Sale Assets will be deemed to acknowledge and represent that it: (a) has had an opportunity to conduct due diligence regarding the Sale Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation, and inspection of any documents and/or the Sale Assets in making its offer; and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Assets, or the completeness of any information provided in connection with the sale.

5.      <u>**Authority To Take Actions**</u>. The Debtors are authorized to take all actions necessary and appropriate to implement and effectuate the relief granted pursuant to this Order and to expend such sums of money and do other things as may be necessary and appropriate to

comply with the requirements established by this Order;  provided, however, that the Debtors shall not amend or revise the Bid Procedures approved hereunder absent notice to and written consent of the Stalking Horse and a further Order of this Court to the extent the proposed amendments or revisions will impact the Stalking Horse's rights thereunder.

6.      **Bulk Transfer Laws**. The Sale shall be conducted without the necessity of complying with any state or local bulk transfer laws or requirements.

7.      **Retention of Jurisdiction**. This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: Brooklyn, New York
       December __, 2023

_____
        United States Bankruptcy Judge

# Exhibit A

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

```
--------------------------------------------------------x
                                    :
In re                               :        Case Nos. 22-bk-40563 (JMM)
                                    :                    22-bk-40562 (JMM)
36TH STREET PROPERTY, INC., and     :
HR 442 CORP.,                       :        Chapter 11
                                    :
                    Debtors.        :
                                    :
--------------------------------------------------------x
```

---

## AUCTION AND BID PROCEDURES

---

1.      **Auction, Generally**.  36th Street Property Inc. (the "Owner Debtor") and HR 442 Corp. (the "Operator Debtor") (collectively, the "Debtors") have received an offer to purchase the Debtors' real estate property, buildings and improvements located at 442 West 36th Street in Manhattan (the "Property") plus all personal and intangible property of the Debtors, (the "Sale Assets") from Hudson West Hospitality, LLC (the "Stalking Horse").  In the event that any party timely submits a competing offer (a "Competing Offer") that is a Qualified Competing Offer (as defined below), Hilco Real Estate LLC ("Hilco") shall conduct an auction (the "Auction") for the Sale Assets.

2.      **Competing Offer Requirements.** For those who wish to participate in the Auction as set forth herein, the below requirements must be met at or before the time their bid is submitted in order for a bid to be considered a "Qualified Competing Offer":

(a)   **Deadline For Submitting Competing Offers**.  Except for the Secured Noteholder, all Competing Offers must be submitted in writing so that they are received by both counsel for the Debtors, counsel for the Secured Noteholder and Hilco, by hard copy or by email, on or before 5:00 pm (Eastern Time) three Business Days before the confirmation hearing date on the Owner Debtor Plan. (the "Competing Offer Deadline") at the following addresses

> **Counsel for the Debtor:**
> Lawrence Morrison, Esq.
> Robert Dakis, Esq.
> Morrison Tenenbaum, PLC
> 87 Walker Street
> New York, New York 10013
> email: lmorrison@m-t-law.com
>            rdakis@m-t-law.com

**Counsel for the Secured Noteholder:**
Keith M. Brandofino, Esq.
Bruce J. Zabarauskas, Esq.
Holland & Knight LLC
31 West 52nd Street
New York, New York 10019
email: keith.brandofino@hklaw.com
       bruce.zabarauskas@hklaw.com

**Hilco:**
Jeff Azuse
Hilco Real Estate, LLC
5 Revere Drive, Suite 410
Northbrook, IL 60062

(b) **Minimum Bid**.  The Competing Offer must be in excess of $18,200,000 by at least $50,000 (the "Minimum Bid") and submitted by the offeror (the "Competing Offeror") in the form of an executed purchase and sale agreement substantially in the form of the Purchase and Sale Agreement which is annexed hereto as Exhibit A.  The purchase and sale agreement shall be executed by a duly authorized officer of the Competing Offeror, and accompanied by a red-lined document showing the differences between the Competing Offeror's proposed purchase and sale agreement, and the Purchase and Sale Agreement annexed to this Motion.

(c)  **Offers For All Sale Assets Only**.  The Competing Offer must be for both the Owner Debtor Sale Assets and Operator Debtor Sale Assets. No offer for only the Owner Debtor Sale Assets or only the Operator Debtor Sale Assets or only a portion of such Sale Assets will be considered.

(d) **Deposit Upon Submission Of Competing Offer**.  Except for the Secured Noteholder, the Competing Offer must be accompanied by a seven hundred fifty thousand ($750,000) deposit to be transferred to counsel for the Debtor by wire transfer (the "Deposit") in accordance with the wiring instructions provided by Debtor's counsel. Each Deposit shall be held by Debtors' counsel in a non-interest bearing escrow account.

(e) **Financial Evidence**.  The Competing Offer must include written evidence of an irrevocable commitment for financing, without any contingency, or other satisfactory written evidence that the Competing Offeror has the financial ability to close and to pay the proposed purchase price in available funds no later than the Closing Date as defined below (the "Financial Evidence");

(f) **Provisions Of Purchase And Sale Agreement Regarding Assumption Of The Loan**.  Any provision of a Competing Offer which seeks to assume the Debtor's obligations under the Loan Documents is subject to the Secured Noteholder's approval, in its sole and absolute direction.  If the Secured Noteholder decides, in its sole and absolute discretion, to deny a Competing Offeror's proposed assumption of the Loan,

then the Competing Offeror must pay the purchase price for the Sale Assets in cash on the Closing Date. For clarification purposes, as of the date of hereof, the Secured Noteholder has only approved the Stalking Horse's proposed assumption of the Debtor's obligations under the Loan Documents, subject to documentation approved by the Secured Noteholder and the Stalking Horse.

(g) **Proof Of Authority**.   Any Competing Offer submitted by an Entity must be accompanied by a board resolution, written consent, or other similar document demonstrating the authority of the Competing Offeror to submit, execute, deliver and close the sale.

(h) **Required Certifications**.  The Competing Offer must contain a certification signed by the Competing Offeror that its understands and agrees that: (i) is bound by the terms of the sale procedures set forth in Article VII of the Owner Debtor Plan and the Sale Procedures Order; (ii) it will act as Back-Up Bidder in the event that there is an Auction for the Sale Assets as provided in the Plan and the Sale Procedures Order and the Competing Offeror submits the second highest and best bid for the Sale Assets; (iii) it has completed any and all due diligence regarding the Sale Assets prior to the Competing Bid Deadline; (iv) there are no contingencies to its Competing Offer, except if the Competing Offer is seeking to assume the Debtors' obligations under the Loan Documents; (v) it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Sale Assets in making its bid; (vi) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Sale Assets, or the completeness of any information provided in connection therewith or the Auction (as hereafter defined); and (v) it shall bear its own costs and expenses, including without limitation title costs.

(i) **Right Of Secured Noteholder To Credit Bid Without Deposit**.  Subparagraphs (a) through (h) shall not apply to the Secured Noteholder, who shall conclusively be deemed to be a Qualified Competing Offeror and shall have the right pursuant to Bankruptcy Code § 363(k) to credit bid at the Auction (as hereafter defined) the full amount of its claim, without the need of making any Deposit; *provided, however*, that the Secured Noteholder's right to credit bid is conditioned upon the existence of a Qualified Competing Offer and if none shall exist, the Sale Assets shall be sold to the Stalking Horse.

Parties that submit a Qualified Competing Offer (each, a "Qualified Bidder") shall be the only parties permitted to bid at the Auction, *provided that* the Stalking Horse and the Secured Noteholder shall be deemed to be Qualified Bidders and may participate in the Auction.

3.     **Auction Information**. If one or more Qualified Competing Offers are submitted by the Competing Offer Deadline, then an auction (the "Auction") of the Sale Assets shall take place in any reasonable manner that; (i) is not inconsistent with these procedures; and (ii) provides Competing Offerors that submitted Qualified Competing Offers with a fair opportunity to participate at the Auction, subject to the requirements set forth below.

(a) **Location And Date Of The Auction**.  The Auction shall take place at the offices of Holland & Knight LLP, 31 West 52nd Street, New York, New York, 10019 on January __, 2024.

(b) **Who May Bid At Auction**. The Stalking Horse, the Secured Noteholder and those parties that timely submitted a Qualified Competing Offer by the Competing Bid Deadline (each, a "Qualified Bidder") will be the only parties permitted to bid at the Auction.  Hilco will notify all parties that submitted a Competing Offer by email whether or not they are Qualified Competing Offerors at least two (2) business days prior to the Auction.

(c) **Mandatory Appearance At Auction**.  Each Qualified Bidder must appear at the Auction through a duly authorized representative.

(d) **Conduct Of The Auction**.  A representative of Hilco will conduct the Auction.

(e) **Initial Auction Bid**.  The highest and best Qualified Competing Offer received by the Competing Bid Deadline will be the "Initial Auction Bid." Hilco will disclose the Initial Auction Bid to all Qualified Bidders by email at least two (2) Business Days prior to the Auction.

(f) **Commencement Of The Auction**.  After the announcement of the Initial Auction Bid, Hilco will request additional bidding at the Auction.

(g) **Bidding Increments**.  A Qualified Bidder, including the Secured Noteholder, may increase its bid as many times as it chooses, provided that each subsequent bid must exceed the prior bid, including the Initial Auction Bid, by at least $25,000.

(h) **Selection Of Winning Bidder**.  The Auction will continue until a Winning Bidder and Back-Up Bidder are selected by the Secured Noteholder and Debtor.  Prior to the conclusion of the Auction, the Secured Noteholder and Debtor will: (i) review each bid submitted at the Auction, on the basis, without limitation, of the amount of the purchase price, the likelihood of the bidder's ability to close the Sale by the Closing Date (as hereafter defined) and the certainty of any financing, (ii) designate the highest and best bid received at the Auction for the Sale Assets (the "Winning Bid") and the Person making such bid as the Winning Bidder as the purchaser of the Sale Assets, subject to Bankruptcy Court Approval, and (iii) designate the next highest and best bid as the back-up bid (the "Back-Up Bid") and the party making such bid as the back-up bidder (the "Back-Up Bidder"), subject to Bankruptcy Court approval.  Upon the designation of the Winning Bid, the Winning Bidder, the Back-Up Bid and the Back-Up Bidder, the Winning Bidder and the Back-Up Bidder shall initial, or otherwise confirm, appropriate changes or modifications to the Purchase and Sale Agreement to reflect the terms of their bids, as applicable.  Upon the completion of such confirmation to the satisfaction of the Secured Noteholder, the Auction shall be concluded and no further bids shall be considered.

(i) **Back-Up Bidder**.  As a condition to qualifying to participate in the Auction, the Stalking Horse and each Competing Offeror that submitted a Qualified Competing Bid

4

shall be deemed to have consented to serve as a Back-Up Bidder  The Back-Up Bidder shall be required to keep its Back-Up Bid open for acceptance and consummation up to and including ten (10) Business Days following the scheduled Closing Date (as hereafter defined), including any extensions thereof; provided, however, that nothing else herein shall be deemed to modify or otherwise alter any other provision in the Purchase and Sale Agreement.

(j) **Hearing To Approve Winning Bid And Back-Up Bidder**.  Subject to the Sale Procedure Order, a hearing to approve the sale of the Owner Debtor Sale Assets to the Winning Bidder, or Back-Up Bidder if the Winning Bidder defaults on its Winning Bid, shall be held at the same date and time as the Confirmation Hearing on the Owner Debtor Plan.

(k) **Return Of Deposits/Closing Date And Back-Up Bidder Closing Date**.  The Winning Bidder shall close on its bid no later than fourteen (14) days after being designated the Winning Bidder (subject to any extensions granted in writing by the Secured Noteholder), time being of the essence (the "Closing Date").  Except as otherwise provided in the Plan or the Sale Procedures Order, all Deposits shall be returned to each bidder at the Auction who is not selected as the Winning Bidder or the Back-Up Bidder by no later than the second (2nd) Business Day following the conclusion of the Auction. If the Successful Bidder closes on the Sale, the Deposit of the Back-Up Bidder shall be returned by Debtor's counsel to the Back-Up Bidder within ten (10) Business Days after the closing of the sale to the Winning Bidder.  If the Winning Bidder fails to close the Sale of the Sale Assets by the Closing Date (as it may be extended with the Secured Noteholder's written consent), then the Back-Up Bidder shall close on the Sale of the Sale Assets pursuant to its Back-Up Bid on a date that is no later than ten (10) Business Days, time being of the essence (subject to any extension of such closing date with the written consent of the Secured Noteholder) after it has been informed by email by Hilco that the Winning Bidder failed to close on the scheduled Closing Date (the "Back-Up Bidder Closing Date").  If the Winning Bidder (or the Back-Up Bidder, as applicable) fails to close on the applicable closing date or otherwise defaults under the Purchase and Sale Agreement, the Debtors' counsel shall transfer the Winning Bidder's (or the Back-Up Bidder's, as applicable) Deposit to the Secured Noteholder who will be entitled to retain the Deposit as liquidated damages.

(l) **Liens Remaining In Effect**.  All liens, claims, encumbrances and interests upon the Sale Assets shall remain in effect until the closing of the Sale, and at closing shall be transferred and attached to the proceeds of the Sale to the same extent and priority that existed immediately before the closing.

4.    **Due Diligence.** It is the responsibility of each interested participant to conduct his/her/their/its owns due diligence and investigate all matters relating to the Sale Assets, including, without limitation, legal matters, physical condition and attributes, environmental matters, economic matters, encumbrances and all other diligence aspects. Participants submit all bids at their own risk, regardless of whether a participant has physically inspected the Sale Assets or not. All bids should be based solely on participant's independent due diligence. Bidders are

encouraged to consult with a licensed real estate broker, contractor, attorney, financial advisor, tax advisor and/or any other relevant professional.

5.      **Terms of the Sale/Free And Clear Sale**. The Debtors agree to sell the Sale Assets to the highest bidder or otherwise best offer for the Estate, free and clear of all liens, claims and encumbrances pursuant to an order of the Bankruptcy Court pursuant to Bankruptcy Code § 363 (the "Sale Order"). The Sale Order shall contain a finding that the purchaser is a good faith purchaser within the meaning of Bankruptcy Code § 363(m).

6.      **As Is And Where Is**.  The sale of the Sale Assets at the Auction is without representation or warranties of any kind, nature or description. The Sale Assets shall be transferred "as is," "where is" and "with all faults." **ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IS EXPRESSLY DISCLAIMED AND THERE SHALL BE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF THE SALE ASSETS OR ANY PORTION THEREOF.** Each bidder for the Sale Assets will be deemed to acknowledge and represent that it: (a) has had an opportunity to conduct due diligence regarding the Sale Assets prior to making its bid; (b) has relied solely upon its own independent review, investigation, and inspection of any documents and/or the Sale Assets in making its bid; and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Assets, or the completeness of any information provided in connection with the Sale or the Auction.

7.      **Identification Information.** The Winning Bidder (other than the Secured Noteholder, if it credit bids) must fully disclose the identity of each entity or person that will be consummating the Sale or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Winning Bidder (other than Secured Noteholder, if it credit bids) and each such entity is legally empowered, by power of attorney or otherwise, to complete the Sale on the terms contemplated by the parties.

8.      **Reservation of rights**. Hilco, subject to obtaining the prior written consent of the Secured Noteholder, shall have the right to modify these Bid Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Sale Assets, including, without limitation: (a) extending the deadlines set forth in these Bid Procedures; (b) adjourning the Auction without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids.

9.      **Consent to jurisdiction**. All Qualified Bidders at the Auction shall be deemed to have consented to the exclusive jurisdiction of the United States Bankruptcy Court for the Eastern District of New York and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bid Procedures, and/or the bid documents, as applicable.

**# End Of Bid Procedures #**

#235096826_v3